KEYISHIAN ET AL. *v.* BOARD OF REGENTS OF
THE UNIVERSITY OF THE STATE OF
NEW YORK ET AL.

No. 105.   Argued November 17, 1966.—Decided January 23, 1967.

590

*Richard Lipsitz* argued the cause for appellants. With him on the briefs was *Rosario J. Di Lorenzo.*

*Ruth V. Iles,* Assistant Attorney General of New York, argued the cause for appellees Board of Regents et al. With her on the brief were *Louis J. Lefkowitz,* Attorney General, and *Ruth Kessler Toch,* Acting Solicitor General. *John C. Crary, Jr.,* argued the cause and filed a brief for appellees Board of Trustees of the State University of New York et al.

*Osmond K. Fraenkel* filed a brief for the American Civil Liberties Union et al., as *amici curiae,* urging reversal. *Ralph F. Fuchs, Bernard Wolfman* and *Herman I. Orentlicher* filed a brief for the American Association of University Professors, as *amicus curiae.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Appellants were members of the faculty of the privately owned and operated University of Buffalo, and became state employees when the University was merged in 1962 into the State University of New York, an institution of higher education owned and operated by the State of New York. As faculty members of the State University their continued employment was conditioned upon their compliance with a New York plan, formulated

partly in statutes and partly in administrative regulations,[1] which the State utilizes to prevent the appointment or retention of "subversive" persons in state employment.

Appellants Hochfield and Maud were Assistant Professors of English, appellant Keyishian an instructor in English, and appellant Garver, a lecturer in philosophy. Each of them refused to sign, as regulations then in effect required, a certificate that he was not a Communist, and that if he had ever been a Communist, he had communicated that fact to the President of the State University of New York. Each was notified that his failure to sign the certificate would require his dismissal. Keyishian's one-year-term contract was not renewed because of his failure to sign the certificate. Hochfield and Garver, whose contracts still had time to run, continue to teach, but subject to proceedings for their dismissal if the constitutionality of the New York plan is sustained. Maud has voluntarily resigned and therefore no longer has standing in this suit.

Appellant Starbuck was a nonfaculty library employee and part-time lecturer in English. Personnel in that classification were not required to sign a certificate but were required to answer in writing under oath the question, "Have you ever advised or taught or were you ever a member of any society or group of persons which taught or advocated the doctrine that the Government of the United States or of any political subdivisions thereof should be overthrown or overturned by force, violence or any unlawful means?" Starbuck refused to answer the question and as a result was dismissed.

Appellants brought this action for declaratory and injunctive relief, alleging that the state program violated the Federal Constitution in various respects. A three-

---

[1] The text of the pertinent statutes and administrative regulations in effect at the time of trial appears in the Appendix to the opinion.

judge federal court held that the program was constitutional. 255 F. Supp. 981.[2] We noted probable jurisdiction of appellants' appeal, 384 U. S. 998. We reverse.

## I.

We considered some aspects of the constitutionality of the New York plan 15 years ago in *Adler* v. *Board of Education,* 342 U. S. 485. That litigation arose after New York passed the Feinberg Law which added § 3022 to the Education Law.[3] The Feinberg Law was enacted to implement and enforce two earlier statutes. The first was a 1917 law, now § 3021 of the Education Law, under which "the utterance of any treasonable or seditious word or words or the doing of any treasonable or seditious act" is a ground for dismissal from the public school system. The second was a 1939 law which was § 12-a of the Civil Service Law when *Adler* was decided and, as amended, is now § 105 of that law. This law disqualifies from the civil service and from employment in the educational system any person who advocates the overthrow of government by force, violence, or any unlawful means, or publishes material advocating such overthrow or organizes or joins any society or group of persons advocating such doctrine.

The Feinberg Law charged the State Board of Regents with the duty of promulgating rules and regulations providing procedures for the disqualification or removal of persons in the public school system who violate the 1917 law or who are ineligible for appointment to or

---

[2] The District Court initially refused to convene a three-judge court, 233 F. Supp. 752, and was reversed by the Court of Appeals for the Second Circuit. 345 F. 2d 236.

[3] For the history of New York loyalty-security legislation, including the Feinberg Law, see Chamberlain, Loyalty and Legislative Action, and that author's article in Gellhorn, The States and Subversion 231.

retention in the public school system under the 1939 law. The Board of Regents was further directed to make a list, after notice and hearing, of "subversive" organizations, defined as organizations which advocate the doctrine of overthrow of government by force, violence, or any unlawful means. Finally, the Board was directed to provide in its rules and regulations that membership in any listed organization should constitute prima facie evidence of disqualification for appointment to or retention in any office or position in the public schools of the State.

The Board of Regents thereupon promulgated rules and regulations containing procedures to be followed by appointing authorities to discover persons ineligible for appointment or retention under the 1939 law, or because of violation of the 1917 law. The Board also announced its intention to list "subversive" organizations after requisite notice and hearing, and provided that membership in a listed organization after the date of its listing should be regarded as constituting prima facie evidence of disqualification, and that membership prior to listing should be presumptive evidence that membership has continued, in the absence of a showing that such membership was terminated in good faith. Under the regulations, an appointing official is forbidden to make an appointment until after he has first inquired of an applicant's former employers and other persons to ascertain whether the applicant is disqualified or ineligible for appointment. In addition, an annual inquiry must be made to determine whether an appointed employee has ceased to be qualified for retention, and a report of findings must be filed.

*Adler* was a declaratory judgment suit in which the Court held, in effect, that there was no constitutional infirmity in former § 12-a or in the Feinberg Law on their faces and that they were capable of constitutional application. But the contention urged in this case that

both § 3021 and § 105 are unconstitutionally vague was not heard or decided. Section 3021 of the Education Law was challenged in *Adler* as unconstitutionally vague, but because the challenge had not been made in the pleadings or in the proceedings in the lower courts, this Court refused to consider it. 342 U. S., at 496. Nor was any challenge on grounds of vagueness made in *Adler* as to subdivisions 1 (a) and (b) of § 105 of the Civil Service Law.[4] Subdivision 3 of § 105 was not added until 1958. Appellants in this case timely asserted below the unconstitutionality of all these sections on grounds of vagueness and that question is now properly before us for decision. Moreover, to the extent that *Adler* sustained the provision of the Feinberg Law constituting membership in an organization advocating forceful overthrow of government a ground for disqualification, pertinent constitutional doctrines have since rejected the premises upon which that conclusion rested. *Adler* is therefore not dispositive of the constitutional issues we must decide in this case.

## II.

A 1953 amendment extended the application of the Feinberg Law to personnel of any college or other institution of higher education owned and operated by the State or its subdivisions. In the same year, the Board of Regents, after notice and hearing, listed the Communist Party of the United States and of the State of New York as "subversive organizations." In 1956 each applicant for an appointment or the renewal of an appointment was required to sign the so-called "Feinberg Certificate" declaring that he had read the Regents Rules and understood that the Rules and the statutes

---

[4] The sole "vagueness" contention in *Adler* concerned the word "subversive," appearing in the preamble to and caption of § 3022. 342 U. S., at 496.

constituted terms of employment, and declaring further that he was not a member of the Communist Party, and that if he had ever been a member he had communicated that fact to the President of the State University. This was the certificate that appellants Hochfield, Maud, Keyishian, and Garver refused to sign.

In June 1965, shortly before the trial of this case, the Feinberg Certificate was rescinded and it was announced that no person then employed would be deemed ineligible for continued employment "solely" because he refused to sign the certificate. In lieu of the certificate, it was provided that each applicant be informed before assuming his duties that the statutes, §§ 3021 and 3022 of the Education Law and § 105 of the Civil Service Law, constituted part of his contract. He was particularly to be informed of the disqualification which flowed from membership in a listed "subversive" organization. The 1965 announcement further provides: "Should any question arise in the course of such inquiry such candidate may request . . . a personal interview. Refusal of a candidate to answer any question relevant to such inquiry by such officer shall be sufficient ground to refuse to make or recommend appointment." A brochure is also given new applicants. It outlines and explains briefly the legal effect of the statutes and invites any applicant who may have any question about possible disqualification to request an interview. The covering announcement concludes that "a prospective appointee who does not believe himself disqualified need take no affirmative action. No disclaimer oath is required."

The change in procedure in no wise moots appellants' constitutional questions raised in the context of their refusal to sign the now abandoned Feinberg Certificate. The substance of the statutory and regulatory complex remains and from the outset appellants' basic claim has been that they are aggrieved by its application.

## III.

Section 3021 requires removal for "treasonable or seditious" utterances or acts. The 1958 amendment to § 105 of the Civil Service Law, now subdivision 3 of that section, added such utterances or acts as a ground for removal under that law also.[5] The same wording is used in both statutes—that "the utterance of any treasonable or seditious word or words or the doing of any treasonable or seditious act or acts" shall be ground for removal. But there is a vital difference between the two laws. Section 3021 does not define the terms "treasonable or

---

[5] There is no merit in the suggestion advanced by the Attorney General of New York for the first time in his brief in this Court that § 3021 of the Education Law and § 105, subd. 3, of the Civil Service Law are not "pertinent to our inquiry." Section 3022 of the Education Law incorporates by reference the provisions of both, thereby rendering them applicable to faculty members of all colleges and institutions of higher education. One of the reasons why the Court of Appeals ordered the convening of a three-judge court was that a substantial federal question was presented by the fact that "Adler . . . refused to pass upon the constitutionality of section 3021 . . . [and that] several statutory amendments, such as Section 105 (3) of the Civil Service Law, are all subsequent to Adler." 345 F. 2d 236, 238. The three-judge court also properly found these provisions applicable to appellants in holding them constitutional. It is significant that appellees consistently defended the constitutionality of these sections in the courts below. Moreover, the three-judge court rendered its decision upon the basis of a "Stipulation of Fact," paragraph 20 of which recites:

"Section 3022 incorporates in full by reference and implements Section 105 of the Civil Service Law and Section 3021 of the New York State Education Law as follows: Subdivision (1) of Section 3022, as amended . . . directs the Board of Regents to adopt and enforce rules and regulations for the elimination of persons barred from employment in the public school system or any college or institution of higher education owned by the State of New York or any political subdivision thereof, by reason of violation of any of the provisions of Section 105 of the Civil Service Law or Section 3021 of the New York State Education Law."

seditious" as used in that section; in contrast, subdivision 3 of § 105 of the Civil Service Law provides that the terms "treasonable word or act" shall mean "treason" as defined in the Penal Law and the terms "seditious word or act" shall mean "criminal anarchy" as defined in the Penal Law.

Our experience under the Sedition Act of 1798, 1 Stat. 596, taught us that dangers fatal to First Amendment freedoms inhere in the word "seditious." See *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 273–276. And the word "treasonable," if left undefined, is no less dangerously uncertain. Thus it becomes important whether, despite the omission of a similar reference to the Penal Law in § 3021, the words as used in that section are to be read as meaning only what they mean in subdivision 3 of § 105. Or are they to be read more broadly and to constitute utterances or acts "seditious" and "treasonable" which would not be so regarded for the purposes of § 105?

Even assuming that "treasonable" and "seditious" in § 3021 and § 105, subd. 3, have the same meaning, the uncertainty is hardly removed. The definition of "treasonable" in the Penal Law presents no particular problem. The difficulty centers upon the meaning of "seditious." Subdivision 3 equates the term "seditious" with "criminal anarchy" as defined in the Penal Law. Is the reference only to Penal Law § 160, defining criminal anarchy as "the doctrine that organized government should be overthrown by force or violence, or by assassination of the executive head or of any of the executive officials of government, or by any unlawful means"? But that section ends with the sentence "The advocacy of such doctrine either by word of mouth or writing is a felony." Does that sentence draw into § 105, Penal Law § 161, proscribing "advocacy of criminal anarchy"? If so, the

possible scope of "seditious" utterances or acts has virtually no limit. For under Penal Law § 161, one commits the felony of advocating criminal anarchy if 'he ". . . publicly displays any book . . . containing or advocating, advising or teaching the doctrine that organized government should be overthrown by force, violence or any unlawful means." [6] Does the teacher who carries a copy of the Communist Manifesto on a public street thereby advocate criminal anarchy? It is no answer to say that the statute would not be applied in such a case. We cannot gainsay the potential effect of this obscure wording on "those with a conscientious and scrupulous regard for such undertakings." *Baggett* v. *Bullitt*, 377 U. S. 360, 374. Even were it certain that the definition referred to in § 105 was solely Penal Law § 160, the scope of § 105 still remains indefinite. The teacher cannot know the extent, if any, to which a "seditious" utterance must transcend mere statement about abstract doctrine, the extent to which it must be intended to and tend to indoctrinate or incite to action in furtherance of the defined doctrine. The crucial consideration is that no teacher can know just where the line is drawn between "seditious" and nonseditious utterances and acts.

Other provisions of § 105 also have the same defect of vagueness. Subdivision 1 (a) of § 105 bars employment of any person who "by word of mouth or writing wilfully and deliberately advocates, advises or teaches the doctrine" of forceful overthrow of government. This provision is plainly susceptible of sweeping and improper application. It may well prohibit the employment of one who merely advocates the doctrine in the abstract without any attempt to indoctrinate others, or incite

---

[6] Penal Law §§ 160–161 are to be replaced effective September 1, 1967, by a single provision entitled "criminal advocacy."

others to action in furtherance of unlawful aims.[7]   See
*Herndon* v. *Lowry,* 301 U. S. 242; *Yates* v. *United States,*
354 U. S. 298; *Noto* v. *United States,* 367 U. S. 290;
*Scales* v. *United States,* 367 U. S. 203.   And in prohibit-
ing "advising" the "doctrine" of unlawful overthrow
does the statute prohibit mere "advising" of the exist-
ence of the doctrine, or advising another to support
the doctrine?   Since "advocacy" of the doctrine of force-
ful overthrow is separately prohibited, need the person
"teaching" or "advising" this doctrine himself "advocate"
it?   Does the teacher who informs his class about the
precepts of Marxism or the Declaration of Independence
violate this prohibition?

Similar uncertainty arises as to the application of sub-
division 1 (b) of § 105.   That subsection requires the
disqualification of an employee involved with the dis-
tribution of written material "containing or advocating,
advising or teaching the doctrine" of forceful overthrow,
and who himself "advocates, advises, teaches, or em-
braces the duty, necessity or propriety of adopting the
doctrine contained therein."   Here again, mere advocacy
of abstract doctrine is apparently included.[8]   And does

---

[7] The New York State Legislative Committee on Public Employee
Security Procedures, in describing this provision, noted:

"In disqualifying for employment those who advocate or teach
the 'doctrine' of the violent overthrow of government, [§ 105] is to
be distinguished from the language of the Smith Act (18 U. S. C.
§§ 371, 2385), which has been construed by the Supreme Court to
make it criminal to incite to 'action' for the forcible overthrow of
government, but not to teach the 'abstract doctrine' of such forcible
overthrow.   *Yates* v. *United States,* 354 U. S. 298 (1957)."   1958
N. Y. State Legis. Annual 70, n. 1.

[8] Compare the Smith Act, 18 U. S. C. § 2385, which punishes one
who "prints, publishes, edits, issues, circulates, sells, distributes, or
publicly displays any written or printed matter advocating, advising,
or teaching the duty, necessity, desirability, or propriety of" unlawful
overthrow, provided he is shown to have an "intent to cause the
overthrow or destruction of any such government."

the prohibition of distribution of matter "containing" the doctrine bar histories of the evolution of Marxist doctrine or tracing the background of the French, American, or Russian revolutions? The additional requirement, that the person participating in distribution of the material be one who "advocates, advises, teaches, or embraces the duty, necessity or propriety of adopting the doctrine" of forceful overthrow, does not alleviate the uncertainty in the scope of the section, but exacerbates it. Like the language of § 105, subd. 1 (a), this language may reasonably be construed to cover mere expression of belief. For example, does the university librarian who recommends the reading of such materials thereby "advocate . . . the . . . propriety of adopting the doctrine contained therein"?

We do not have the benefit of a judicial gloss by the New York courts enlightening us as to the scope of this complicated plan.[9] In light of the intricate administrative machinery for its enforcement, this is not surprising. The very intricacy of the plan and the uncertainty as to the scope of its proscriptions make it a highly efficient *in terrorem* mechanism. It would be a bold teacher who would not stay as far as possible from utterances or acts which might jeopardize his living by enmeshing him in this intricate machinery. The uncertainty as to the utterances and acts proscribed increases that caution in "those who believe the written law means what it says." *Baggett* v. *Bullitt, supra,* at 374. The result must be to stifle "that free play of the spirit which all teachers ought especially to cultivate and practice . . . ."[10] That probability is enhanced by the provisions requiring an

---

[9] This is not a case where abstention pending state court interpretation would be appropriate, *Baggett* v. *Bullitt, supra,* at 375–379; *Dombrowski* v. *Pfister,* 380 U. S. 479, 489–490.

[10] *Wieman* v. *Updegraff,* 344 U. S. 183, 195 (Frankfurter, J., concurring).

annual review of every teacher to determine whether any utterance or act of his, inside the classroom or out, came within the sanctions of the laws. For a memorandum warns employees that under the statutes "subversive" activities may take the form of "[t]he writing of articles, the distribution of pamphlets, the endorsement of speeches made or articles written or acts performed by others," and reminds them "that it is a primary duty of the school authorities in each school district to take positive action to eliminate from the school system any teacher in whose case there is evidence that he is guilty of subversive activity. School authorities are under obligation to proceed immediately and conclusively in every such case."

There can be no doubt of the legitimacy of New York's interest in protecting its education system from subversion. But "even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton* v. *Tucker*, 364 U. S. 479, 488. The principle is not inapplicable because the legislation is aimed at keeping subversives out of the teaching ranks. In *De Jonge* v. *Oregon*, 299 U. S. 353, 365, the Court said:

> "The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government."

Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton* v. *Tucker, supra,* at 487. The classroom is peculiarly the "marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, [rather] than through any kind of authoritative selection." *United States* v. *Associated Press,* 52 F. Supp. 362, 372. In *Sweezy* v. *New Hampshire,* 354 U. S. 234, 250, we said:

"The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die."

We emphasize once again that "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms," *N. A. A. C. P.* v. *Button,*

371 U. S. 415, 438; "[f]or standards of permissible statutory vagueness are strict in the area of free expression. . . . Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Id.*, at 432–433. New York's complicated and intricate scheme plainly violates that standard. When one must guess what conduct or utterance may lose him his position, one necessarily will "steer far wider of the unlawful zone . . . ." *Speiser* v. *Randall*, 357 U. S. 513, 526. For "[t]he threat of sanctions may deter . . . almost as potently as the actual application of sanctions." *N. A. A. C. P.* v. *Button, supra,* at 433. The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed. See *Stromberg* v. *California,* 283 U. S. 359, 369; *Cramp* v. *Board of Public Instruction,* 368 U. S. 278; *Baggett* v. *Bullitt, supra.*

The regulatory maze created by New York is wholly lacking in "terms susceptible of objective measurement." *Cramp* v. *Board of Public Instruction, supra,* at 286. It has the quality of "extraordinary ambiguity" found to be fatal to the oaths considered in *Cramp* and *Baggett* v. *Bullitt.* "[M]en of common intelligence must necessarily guess at its meaning and differ as to its application . . . ." *Baggett* v. *Bullitt, supra,* at 367. Vagueness of wording is aggravated by prolixity and profusion of statutes, regulations, and administrative machinery, and by manifold cross-references to interrelated enactments and rules.

We therefore hold that § 3021 of the Education Law and subdivisions 1 (a), 1 (b) and 3 of § 105 of the Civil Service Law as implemented by the machinery created pursuant to § 3022 of the Education Law are unconstitutional.

## IV.

Appellants have also challenged the constitutionality of the discrete provisions of subdivision 1 (c) of § 105 and subdivision 2 of the Feinberg Law, which make Communist Party membership, as such, prima facie evidence of disqualification. The provision was added to subdivision 1 (c) of § 105 in 1958 after the Board of Regents, following notice and hearing, listed the Communist Party of the United States and the Communist Party of the State of New York as "subversive" organizations. Subdivision 2 of the Feinberg Law was, however, before the Court in *Adler* and its constitutionality was sustained. But constitutional doctrine which has emerged since that decision has rejected its major premise. That premise was that public employment, including academic employment, may be conditioned upon the surrender of constitutional rights which could not be abridged by direct government action. Teachers, the Court said in *Adler*, "may work for the school system upon the reasonable terms laid down by the proper authorities of New York. If they do not choose to work on such terms, they are at liberty to retain their beliefs and associations and go elsewhere." 342 U. S., at 492. The Court also stated that a teacher denied employment because of membership in a listed organization "is not thereby denied the right of free speech and assembly. His freedom of choice between membership in the organization and employment in the school system might be limited, but not his freedom of speech or assembly, except in the remote sense that limitation is inherent in every choice." *Id.*, at 493.

However, the Court of Appeals for the Second Circuit correctly said in an earlier stage of this case, ". . . the theory that public employment which may be denied altogether may be subjected to any conditions, regardless

of how unreasonable, has been uniformly rejected."
*Keyishian* v. *Board of Regents,* 345 F. 2d 236, 239. In-
deed, that theory was expressly rejected in a series of
decisions following *Adler.* See *Wieman* v. *Updegraff,*
344 U. S. 183; *Slochower* v. *Board of Education,* 350
U. S. 551; *Cramp* v. *Board of Public Instruction, supra;*
*Baggett* v. *Bullitt, supra; Shelton* v. *Tucker, supra;*
*Speiser* v. *Randall, supra;* see also *Schware* v. *Board of
Bar Examiners,* 353 U. S. 232; *Torcaso* v. *Watkins,* 367
U. S. 488. In *Sherbert* v. *Verner,* 374 U. S. 398, 404, we
said: "It is too late in the day to doubt that the liberties
of religion and expression may be infringed by the denial
of. or placing of conditions upon a benefit or privilege."

We proceed then to the question of the validity of the
provisions of subdivision 1 (c) of § 105 and subdivision 2
of § 3022, barring employment to members of listed
organizations. Here again constitutional doctrine has
developed since *Adler.* Mere knowing membership with-
out a specific intent to further the unlawful aims of an
organization is not a constitutionally adequate basis for
exclusion from such positions as those held by appellants.

In *Elfbrandt* v. *Russell,* 384 U. S. 11, we said, "Those
who join an organization but do not share its unlawful
purposes and who do not participate in its unlawful
activities surely pose no threat, either as citizens or as
public employees." *Id.,* at 17. We there struck down a
statutorily required oath binding the state employee not
to become a member of the Communist Party with knowl-
edge of its unlawful purpose, on threat of discharge and
perjury prosecution if the oath were violated. We found
that "[a]ny lingering doubt that proscription of mere
knowing membership, without any showing of 'specific
intent,' would run afoul of the Constitution was set at rest
by our decision in *Aptheker* v. *Secretary of State,* 378
U. S. 500." *Elfbrandt* v. *Russell, supra,* at 16. In *Ap-
theker* we held that Party membership, without knowl-

edge of the Party's unlawful purposes *and* specific intent to further its unlawful aims, could not constitutionally warrant deprivation of the right to travel abroad. As we said in *Schneiderman* v. *United States,* 320 U. S. 118, 136, "[U]nder our traditions beliefs are personal and not a matter of mere association, and . . . men in adhering to a political party or other organization . . . do not subscribe unqualifiedly to all of its platforms or asserted principles." "A law which applies to membership without the 'specific intent' to further the illegal aims of the organization infringes unnecessarily on protected freedoms. It rests on the doctrine of 'guilt by association' which has no place here." *Elfbrandt, supra,* at 19. Thus mere Party membership, even with knowledge of the Party's unlawful goals, cannot suffice to justify criminal punishment, see *Scales* v. *United States,* 367 U. S. 203; *Noto* v. *United States,* 367 U. S. 290; *Yates* v. *United States,* 354 U. S. 298;[11] nor may it warrant a finding of moral unfitness justifying disbarment. *Schware* v. *Board of Bar Examiners,* 353 U. S. 232.

These limitations clearly apply to a provision, like § 105, subd. 1 (c), which blankets all state employees, regardless of the "sensitivity" of their positions. But even the Feinberg Law provision, applicable primarily to activities of teachers, who have captive audiences of young minds, are subject to these limitations in favor of freedom of expression and association; the stifling effect on the academic mind from curtailing freedom of association in such manner is manifest, and has been documented in recent studies.[12] *Elfbrandt* and *Aptheker* state the

---

[11] Whether or not loss of public employment constitutes "punishment," cf. *United States* v. *Lovett,* 328 U. S. 303, there can be no doubt that the repressive impact of the threat of discharge will be no less direct or substantial.

[12] See Lazarsfeld & Thielens, The Academic Mind 92–112, 192–217; Biddle, The Fear of Freedom 155 *et seq.;* Jahoda & Cook,

608

governing standard: legislation which sanctions membership unaccompanied by specific intent to further the unlawful goals of the organization or which is not active membership violates constitutional limitations.

Measured against this standard, both Civil Service Law § 105, subd. 1 (c), and Education Law § 3022, subd. 2, sweep overbroadly into association which may not be proscribed. The presumption of disqualification arising from proof of mere membership may be rebutted, but only by (a) a denial of membership, (b) a denial that the organization advocates the overthrow of government by force, or (c) a denial that the teacher has knowledge of such advocacy. *Lederman* v. *Board of Education*, 276 App. Div. 527, 96 N. Y. S. 2d 466, aff'd, 301 N. Y. 476, 95 N. E. 2d 806.[13] Thus proof of nonactive membership or a showing of the absence of intent to further unlawful aims will not rebut the presumption and defeat dismissal. This is emphasized in official administrative interpretations. For example, it is said in a letter addressed to prospective appointees by the President of the State University, "You will note that . . . both the Law and regulations are very specifically directed toward the elimination and nonappointment of 'Communists' from or to our teaching ranks . . . ." The Feinberg Certificate was even more explicit: "Anyone who is a

Security Measures and Freedom of Thought: An Exploratory Study of the Impact of Loyalty and Security Programs, 61 Yale L. J. 295 (1952). See generally, MacIver, Academic Freedom in Our Time; Hullfish, Educational Freedom in an Age of Anxiety; Konvitz, Expanding Liberties 86–108; Morris, Academic Freedom and Loyalty Oaths, 28 Law & Contemp. Prob. 487 (1963).

[13] In light of our disposition, we need not consider appellants' contention that the burden placed on the employee of coming forward with substantial rebutting evidence upon proof of membership in a listed organization is constitutionally impermissible. Compare *Speiser* v. *Randall*, 357 U. S. 513.

*member* of the Communist Party or of any organization that advocates the violent overthrow of the Government of the United States or of the State of New York or any political subdivision thereof cannot be employed by the State University." (Emphasis supplied.) This official administrative interpretation is supported by the legislative preamble to the Feinberg Law, § 1, in which the legislature concludes as a result of its findings that "it is essential that the laws prohibiting persons who are *members* of subversive groups, such as the communist party and its affiliated organizations, from obtaining or retaining employment in the public schools, be rigorously enforced." (Emphasis supplied.)

Thus § 105, subd. 1 (c), and § 3022, subd. 2, suffer from impermissible "overbreadth." *Elfbrandt* v. *Russell, supra,* at 19; *Aptheker* v. *Secretary of State, supra; N. A. A. C. P.* v. *Button, supra; Saia* v. *New York,* 334 U. S. 558; *Schneider* v. *State,* 308 U. S. 147; *Lovell* v. *Griffin,* 303 U. S. 444; cf. *Hague* v. *C. I. O.,* 307 U. S. 496, 515–516; see generally *Dombrowski* v. *Pfister,* 380 U. S. 479, 486. They seek to bar employment both for association which legitimately may be proscribed and for association which may not be proscribed consistently with First Amendment rights. Where statutes have an overbroad sweep, just as where they are vague, "the hazard of loss or substantial impairment of those precious rights may be critical," *Dombrowski* v. *Pfister, supra,* at 486, since those covered by the statute are bound to limit their behavior to that which is unquestionably safe. As we said in *Shelton* v. *Tucker, supra,* at 488, "The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose."

We therefore hold that Civil Service Law § 105, subd. 1 (c), and Education Law § 3022, subd. 2, are invalid insofar as they proscribe mere knowing membership

without any showing of specific intent to further the unlawful aims of the Communist Party of the United States or of the State of New York.

The judgment of the District Court is reversed and the case is remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

## APPENDIX TO OPINION OF THE COURT.

### CIVIL SERVICE LAW.

§ 105. Subversive activities; disqualification

1. Ineligibility of persons advocating overthrow of government by force or unlawful means. No person shall be appointed to any office or position in the service of the state or of any civil division thereof, nor shall any person employed in any such office or position be continued in such employment, nor shall any person be employed in the public service as superintendent, principal or teacher in a public school or academy or in a state college or any other state educational institution who:

(a) by word of mouth or writing wilfully and deliberately advocates, advises or teaches the doctrine that the government of the United States or of any state or of any political subdivision thereof should be overthrown or overturned by force, violence or any unlawful means; or

(b) prints, publishes, edits, issues or sells any book, paper, document or written or printed matter in any form containing or advocating, advising or teaching the doctrine that the government of the United States or of any state or of any political subdivision thereof should be overthrown by force, violence or any unlawful means, and who advocates, advises, teaches, or embraces the duty, necessity or propriety of adopting the doctrine contained therein; or

(c) organizes or helps to organize or becomes a member of any society or group of persons which teaches or advocates that the government of the United States or of any state or of any political subdivision thereof shall be overthrown by force or violence, or by any unlawful means.

For the purposes of this section, membership in the communist party of the United States of America or the communist party of the state of New York shall constitute prima facie evidence of disqualification for appointment to or retention in any office or position in the service of the state or of any city or civil division thereof.

2. A person dismissed or declared ineligible pursuant to this section may within four months of such dismissal or declaration of ineligibility be entitled to petition for an order to show cause signed by a justice of the supreme court, why a hearing on such charges should not be had. Until the final judgment on said hearing is entered, the order to show cause shall stay the effect of any order of dismissal or ineligibility based on the provisions of this section; provided, however, that during such stay a person so dismissed shall be suspended without pay, and if the final determination shall be in his favor he shall be restored to his position with pay for the period of such suspension less the amount of compensation which he may have earned in any other employment or occupation and any unemployment insurance benefits he may have received during such period. The hearing shall consist of the taking of testimony in open court with opportunity for cross examination. The burden of sustaining the validity of the order of dismissal or ineligibility by a fair preponderance of the credible evidence shall be upon the person making such dismissal or order of ineligibility.

3. Removal for treasonable or seditious acts or utterances. A person in the civil service of the state or of

any civil division thereof shall be removable therefrom for the utterance of any treasonable or seditious word or words or the doing of any treasonable or seditious act or acts while holding such position. For the purpose of this subdivision, a treasonable word or act shall mean "treason," as defined in the penal law; a seditious word or act shall mean "criminal anarchy" as defined in the penal law.

## EDUCATION LAW.

### § 3021. Removal of superintendents, teachers and employees for treasonable or seditious acts or utterances

A person employed as superintendent of schools, teacher or employee in the public schools, in any city or school district of the state, shall be removed from such position for the utterance of any treasonable or seditious word or words or the doing of any treasonable or seditious act or acts while holding such position.

### § 3022. Elimination of subversive persons from the public school system

1. The board of regents shall adopt, promulgate, and enforce rules and regulations for the disqualification or removal of superintendents of schools, teachers or employees in the public schools in any city or school district of the state and the faculty members and all other personnel and employees of any college or other institution of higher education owned and operated by the state or any subdivision thereof who violate the provisions of section three thousand twenty-one of this article or who are ineligible for appointment to or retention in any office or position in such public schools or such institutions of higher education on any of the grounds set forth in section twelve-a of the civil service law and shall provide therein appropriate methods and procedure for the enforcement of such sections of this article and the civil service law.

2. The board of regents shall, after inquiry, and after such notice and hearing as may be appropriate, make a listing of organizations which it finds to be subversive in that they advocate, advise, teach or embrace the doctrine that the government of the United States or of any state or of any political subdivision thereof shall be overthrown or overturned by force, violence or any unlawful means, or that they advocate, advise, teach or embrace the duty, necessity or propriety of adopting any such doctrine, as set forth in section twelve-a of the civil service law. Such listings may be amended and revised from time to time. The board, in making such inquiry, may utilize any similar listings or designations promulgated by any federal agency or authority authorized by federal law, regulation or executive order, and for the purposes of such inquiry, the board may request and receive from such federal agencies or authorities any supporting material or evidence that may be made available to it. The board of regents shall provide in the rules and regulations required by subdivision one hereof that membership in any such organization included in such listing made by it shall constitute prima facie evidence of disqualification for appointment to or retention in any office or position in the public schools of the state.

3. The board of regents shall annually, on or before the fifteenth day of February, by separate report, render to the legislature, a full statement of measures taken by it for the enforcement of such provisions of law and to require compliance therewith. Such reports shall contain a description of surveys made by the board of regents, from time to time, as may be appropriate, to ascertain the extent to which such provisions of law have been enforced in the city and school districts of the state.

RULES OF THE BOARD OF REGENTS.

(Adopted July 15, 1949.)

ARTICLE XVIII.

## SUBVERSIVE ACTIVITIES.

Section 244. Disqualification or removal of superintendents, teachers and other employes.

1 The school authorities of each school district shall take all necessary action to put into effect the following procedures for disqualification or removal of superintendents, teachers or other employes who violate the provisions of section 3021 of the Education Law or section 12-a* of the Civil Service Law.

a Prior to the appointment of any superintendent, teacher or employe, the nominating official, in addition to making due inquiry as to the candidate's academic record, professional training, experience and personal qualities, shall inquire of prior employers, and such other persons as may be in a position to furnish pertinent information, as to whether the candidate is known to have violated the aforesaid statutory provisions, including the provisions with respect to membership in organizations listed by the Board of Regents as subversive in accordance with paragraph 2 hereof. No person who is found to have violated the said statutory provisions shall be eligible for employment.

b The school authorities shall require one or more of the officials in their employ, whom they shall designate for such purpose, to submit to them in writing not later than October 31, 1949, and not later than September 30th of each school year thereafter, a report on each teacher or other employe. Such report shall either (1) state that there is no evidence indicating that such teacher or other employe has violated the statutory provisions herein re-

*Now section 105.

ferred to, including the provisions with respect to membership in organizations listed by the Regents as subversive in accordance with paragraph 2 hereof; or (2) where there is evidence indicating a violation of said statutory provisions, including membership in such a subversive organization, recommend that action be taken to dismiss such teacher or other employe, on the ground of a specified violation or violations of the law.

c The school authorities shall themselves prepare such reports on the superintendent of schools and such other officials as may be directly responsible to them, including the officials designated by them in accordance with subdivision b of this paragraph.

d The school authorities shall proceed as promptly as possible, and in any event within 90 days after the submission of the recommendations required in subdivision b of this paragraph, either to prefer formal charges against superintendents, teachers or other employes for whom the evidence justifies such action, or to reject the recommendations for such action.

e Following the determination required in subdivision d of this paragraph, the school authorities shall immediately institute proceedings for the dismissal of superintendents, teachers or other employes in those cases in which in their judgment the evidence indicates violation of the statutory provisions herein referred to. In proceedings against persons serving on probation or those having tenure, the appropriate statutory procedure for dismissal shall be followed. In proceedings against persons serving under contract and not under the provisions of a tenure law, the school authorities shall conduct such hearings on charges as they deem the exigencies warrant, before taking final action on dismissal. In all cases all rights to a fair trial, representation by counsel and appeal or court review as provided by statute or the Constitution shall be scrupulously observed.

616

2   Pursuant to chapter 360 of the Laws of 1949, the Board of Regents will issue a list, which may be amended and revised from time to time, of organizations which the Board finds to be subversive in that they advocate, advise, teach or embrace the doctrine that the Government of the United States, or of any state or of any political subdivision thereof, shall be overthrown or overturned by force, violence or any unlawful means, or that they advocate, advise, teach or embrace the duty, necessity or propriety of adopting any such doctrine, as set forth in section 12-a* of the Civil Service Law.  Evidence of membership in any organization so listed on or after the tenth day subsequent to the date of official promulgation of such list shall constitute prima facie evidence of disqualification for appointment to or retention of any office or position in the school system.  Evidence of membership in such an organization prior to said day shall be presumptive evidence that membership has continued, in the absence of a showing that such membership has been terminated in good faith.

3   On or before the first day of December of each year, the school authorities of each school district shall render to the Commissioner of Education a full report, officially adopted by the school authorities and signed by their presiding officer, of the measures taken by them for the enforcement of these regulations during the calendar year ending on the 31st day of October preceding.  Such report shall include a statement as to (a) the total number of superintendents, teachers and other employes in the employ of the school district; (b) the number of superintendents, teachers and other employes as to whom the school authorities and/or the officials designated by them have reported that there is no evidence indicating that such employes have violated the statutory provisions

*Now section 105.

herein referred to, including the provisions with respect to membership in organizations listed by the Regents as subversive; and (c) the number of superintendents, teachers and other employes in whose cases the school authorities and/or the officials designated by them have recommended that action be taken to dismiss the employes in question, on the grounds of specified violations of the law or evidence of membership in a subversive organization. Such report shall also include, for the group listed under (c) above, a statement of (d) the number of cases in which charges have been or are to be preferred and the status or final disposition of each of these cases; (e) the number of cases in which the school authorities have concluded that the evidence reported by the designated officials does not warrant the preferring of charges; and (f) the number of cases in which the school authorities have not determined, as of October 31st of the school year in question, on the action to be taken.

4   Immediately upon the finding by school authorities that any person is disqualified for appointment or retention in employment under these regulations, said school authorities shall report to the Commissioner of Education the name of such person and the evidence supporting his disqualification, including a transcript of the official records of hearings on charges, if any, which have been conducted.

## PENAL LAW.

### § 160.   Criminal anarchy defined

Criminal anarchy is the doctrine that organized government should be overthrown by force or violence, or by assassination of the executive head or of any of the executive officials of government, or by any unlawful means. The advocacy of such doctrine either by word of mouth or writing is a felony.

618

§ 161.  Advocacy of criminal anarchy

Any person who:

1. By word of mouth or writing advocates, advises or teaches the duty, necessity or propriety of overthrowing or overturning organized government by force or violence, or by assassination of the executive head or of any of the executive officials of government, or by any unlawful means; or,

2. Prints, publishes, edits, issues or knowingly circulates, sells, distributes or publicly displays any book, paper, document, or written or printed matter in any form, containing or advocating, advising or teaching the doctrine that organized government should be overthrown by force, violence or any unlawful means; or,

3. Openly, wilfully and deliberately justifies by word of mouth or writing the assassination or unlawful killing or assaulting of any executive or other officer of the United States or of any state or of any civilized nation having an organized government because of his official character, or any other crime, with intent to teach, spread or advocate the propriety of the doctrines of criminal anarchy; or,

4. Organizes or helps to organize or becomes a member of or voluntarily assembles with any society, group or assembly of persons formed to teach or advocate such doctrine.

Is guilty of a felony and punishable by imprisonment for not more than ten years, or by a fine of not more than five thousand dollars, or both.

RESOLUTIONS OF THE BOARD OF TRUSTEES OF THE
STATE UNIVERSITY OF NEW YORK.

*Resolved* that Resolution 65–100 adopted May 13, 1965, be and the same hereby is, amended to read as follows:

*Resolved* that Resolution No. 56–98 adopted on October 11, 1956, incorporated into the Policies of

the Board of Trustees as Section 3 of Title B of Article XI thereof, and the Procedure on New Academic Appointments therein referred to, be, and the same hereby are, *Rescinded,* and

*Further Resolved* that Title B of Article XI of the Policies of the Board of Trustees be amended by adding a new Section 3 thereto to read as follows:

§ 3. Procedure for appointments.

Before any initial appointment shall hereafter be made to any position certified to be in the professional service of the University pursuant to Section 35 of the Civil Service Law the officer authorized to make such appointment or to make the initial recommendation therefor shall send or give to the prospective appointee a statement prepared by the President concisely explaining the disqualification imposed by Section 105 of the Civil Service Law and by Section 3022 of the Education Law and the Rules of the Board of Regents thereunder, including the presumption of such disqualification by reason of membership in organizations listed by the Board of Regents. Such officer, in addition to due inquiry as to the candidate's record, professional training, experience and personal qualities, shall make or cause to be made such further inquiry as may be needed to satisfy him as to whether or not such candidate is disqualified under the provisions of such statute and rules. Should any question arise in the course of such inquiry such candidate may request or such officer may require a personal interview. Refusal of a candidate to answer any question relevant to such inquiry by such officer shall be sufficient ground to refuse to make or recommend appointment. An appointment or recommendation for appointment shall constitute a certification by the appointing or

recommending officer that due inquiry has been made and that he finds no reason to believe that the candidate is disqualified for the appointment.

*Further Resolved* that this resolution shall become effective July 1, 1965, provided, however, that this resolution shall become effective immediately with respect to appointments made or recommended prior to July 1, 1965 to take effect on or after that date.

*Resolved* that any person presently employed or heretofore employed by the University who has failed to sign the certificate required by the Procedure on New Academic Appointments adopted on October 11, 1956, shall not be deemed disqualified or ineligible solely by reason of such failure, for appointment or reappointment in the professional service of the University in the manner provided in new Section 3 of Title B of Article XI of the Policies of the Board of Trustees as adopted by resolution this day; and

*Further Resolved* that any person presently employed by the University shall not be deemed ineligible or disqualified for continuance in his employment during the prescribed term thereof, nor be subject to charges of misconduct, solely by reason of such failure, provided he is found qualified for such continuance by the Chief Administrative officer of the institution at which he is employed in accordance with the procedures prescribed in said new Section 3 of Title B of Article XI of the Policies of the Board of Trustees.

MR. JUSTICE CLARK, with whom MR. JUSTICE HARLAN, MR. JUSTICE STEWART and MR. JUSTICE WHITE join, dissenting.

The blunderbuss fashion in which the majority couches "its artillery of words," together with the morass of cases it cites as authority and the obscurity of their application

to the question at hand, makes it difficult to grasp the true thrust of its decision. At the outset, it is therefore necessary to focus on its basis.

This is a declaratory judgment action testing the *application* of the Feinberg Law to appellants. The certificate and statement once required by the Board of Trustees of the State University and upon which appellants base their attack were, before the case was tried, abandoned by the Board and are no longer required to be made. Despite this fact the majority proceeds to its decision striking down New York's Feinberg Law and other statutes as applied to appellants on the basis of the old certificate and statement. It does not explain how the statute can be applied to appellants under procedures which have been for almost two years a dead letter. The issues posed are, therefore, purely abstract and entirely speculative in character. The Court under such circumstances has in the past refused to pass upon constitutional questions. In addition, the appellants have neither exhausted their administrative remedies, nor pursued the remedy of judicial review of agency action as provided earlier by subdivision (d) of § 12–a of the Civil Service Law. Finally, one of the sections stricken, § 105, subd. 3, has been amended by a revision which under its terms will not become effective until September 1, 1967. (Laws 1965, c. 1030, § 240.15, Revised Penal Law of 1965.)

## I.

The old certificate upon which the majority operates required all of the appellants, save Starbuck, to answer the query whether they were Communists, and if they were, whether they had communicated that fact to the President of the State University. Starbuck was required to answer whether he had ever advised, taught, or been a member of a group which taught or advocated the doctrine that the Government of the United States, or any

of its political subdivisions, should be overthrown by force, violence, or any unlawful means. All refused to comply. It is in this nonexistent frame of reference that the majority proceeds to act.

It is clear that the Feinberg Law, in which this Court found "no constitutional infirmity" in 1952, has been given its death blow today. Just as the majority here finds that there "can be no doubt of the legitimacy of New York's interest in protecting its education system from subversion" there can also be no doubt that "the be-all and end-all" of New York's effort is here. And, regardless of its correctness, neither New York nor the several States that have followed the teaching of *Adler* v. *Board of Education,* 342 U. S. 485, for some 15 years, can ever put the pieces together again. No court has ever reached out so far to destroy so much with so little.

The section (§ 3021 of the Education Law) which authorizes the removal of superintendents, teachers, or employees in the public schools in any city or school district of New York for the utterance of any treasonable or seditious word or words is also struck down, even though it does not apply to appellants, as we shall discuss below.

Also declared unconstitutional are the subdivisions (1 (a), 1 (b) and 1 (c) of § 105 of the Civil Service Law) which prevent the appointment and authorize the discharge of any superintendent, principal, or teacher in any part of New York's public education establishment who wilfully advocates, advises, or teaches the doctrine that the Government of the United States, or of any State or any political subdivision thereof should be overthrown by force, violence, or any other unlawful means (1 (a)); or who prints, publishes, edits, issues, or sells any book, paper, document, or written or printed matter, in any form, containing such doctrine *and* "who advocates, advises, teaches, or embraces the duty, necessity or

propriety of adopting the doctrine contained therein" (1 (b)); or who organizes or helps to organize or becomes a member of any society or group which teaches or advocates such doctrine (1 (c)). This latter provision was amended in 1958, while still part of § 12–a of the Civil Service Law, to make membership in the Communist Party prima facie proof of disqualification. The language "advocate, advise, teach," etc., obviously springs from federal statutes, particularly the Smith Act, § 2 (a)(1), (2) and (3), 54 Stat. 671, which was approved by this Court in *Dennis* v. *United States,* 341 U. S. 494 (1951). State statutes of similar character and language have been approved by this Court. See *Garner* v. *Board of Public Works of Los Angeles,* 341 U. S. 716 (1951); *Beilan* v. *Board of Education,* 357 U. S. 399 (1958).

Lastly stricken is the subdivision (3 of § 105) which authorizes the discharge of any person in the civil service of the State or any civil division thereof who utters any treasonable or seditious word or commits any treasonable or seditious act, although this subdivision is not and never has been a part of the Feinberg Law and New York specifically disclaims its applicability to the appellants. In addition, how can the Court pass upon this law *as applied* when the State has never attempted to and now renounces its application to appellants?

## II.

This Court has again and again, since at least 1951, approved procedures either identical or at the least similar to the ones the Court condemns today. In *Garner* v. *Board of Public Works of Los Angeles, supra,* we held that a public employer was not precluded, simply because it was an agency of the State, "from inquiring of its employees as to matters that may prove relevant to their fitness and suitability for the public service." 341 U. S., at 720. The oath there used practically the same lan-

guage as the Starbuck statement here and the affidavit reflects the same type of inquiry as was made in the old certificate condemned here. Then in 1952, in *Adler* v. *Board of Education, supra,* this Court passed upon the identical statute condemned here. It, too, was a declaratory judgment action—as in this case. However, there the issues were not so abstractly framed. Our late Brother Minton wrote for the Court:

> "A teacher works in a sensitive area in a schoolroom. There he shapes the attitude of young minds towards the society in which they live. In this, the state has a vital concern. It must preserve the integrity of the schools. That the school authorities have the right and the duty to screen the officials, teachers, and employees as to their fitness to maintain the integrity of the schools as a part of ordered society, cannot be doubted." At 493.

And again in 1958 the problem was before us in *Beilan* v. *Board of Education, supra.* There our late Brother Burton wrote for the Court:

> "By engaging in teaching in the public schools, petitioner did not give up his right to freedom of belief, speech or association. He did, however, undertake obligations of frankness, candor and cooperation in answering inquiries made of him by his employing Board examining into his fitness to serve it as a public school teacher." 357 U. S., at 405.

And on the same day in *Lerner* v. *Casey,* 357 U. S. 468, our Brother HARLAN again upheld the severance of a public employee for his refusal to answer questions concerning his loyalty. And also on the same day my Brother BRENNAN himself cited *Garner* with approval in *Speiser* v. *Randall,* 357 U. S. 513 (1958).

Since that time the *Adler* line of cases has been cited again and again with approval: *Shelton* v. *Tucker,* 364

U. S. 479 (1960), in which both *Adler* and *Beilan* were quoted with approval, and *Garner* and *Lerner* were cited in a like manner; likewise in *Cramp* v. *Board of Public Instruction,* 368 U. S. 278 (1961), *Adler* was quoted twice with approval; and, in a related field where the employee was discharged for refusal to answer questions as to his loyalty after being ordered to do so, *Nelson* v. *Los Angeles County,* 362 U. S. 1 (1960), the Court cited with approval all of the cases which today it says have been rejected, *i. e., Garner, Adler, Beilan* and *Lerner.* Later *Konigsberg* v. *State Bar,* 366 U. S. 36 (1961), likewise cited with approval both *Beilan* and *Garner.* And in our decision in *In re Anastaplo,* 366 U. S. 82 (1961), *Garner, Beilan* and *Lerner* were all referred to. Finally, only three Terms ago my Brother WHITE relied upon *Cramp,* which in turn cited *Adler* with approval twice. See *Baggett* v. *Bullitt,* 377 U. S. 360 (1964).

In view of this long list of decisions covering over 15 years of this Court's history, in which no opinion of this Court even questioned the validity of the *Adler* line of cases, it is strange to me that the Court now finds that the "constitutional doctrine which has emerged since . . . has rejected [*Adler's*] major premise." With due respect, as I read them, our cases have done no such thing.

### III.

The majority also finds that *Adler* did not pass upon § 3021 of the Education Law, nor subdivision 3 of § 105 of the Civil Service Law, nor upon the vagueness questions of subdivisions 1 (a), 1 (b) and 1 (c) of § 105. I will now discuss them.

1. Section 3021 is not applicable to these appellants. As Attorney General Lefkowitz of New York says on behalf of the State, the Board of Regents and the Civil Service Commission, this section by its own terms applies only to superintendents, teachers, and employees in the

"public schools, in any city or school district of the state . . . ." It does not apply to teachers in the State University at all.*

2. Likewise subdivision 3 of § 105 is also inapplicable. It was derived from § 23–a of the Civil Service Law. The latter provision was on the books at the time of the Feinberg Law as well as when *Adler* was decided. The Feinberg Law referred only to § 12–a of the Civil Service Law, not § 23–a. Section 12–a was later recodified as subdivisions 1 (a), (b) and (c) of § 105 of the Civil Service Law. Section 23–a (now § 105, subd. 3) deals only with the civil divisions of the civil service of the State. As the Attorney General tells us, the law before us has to do with the qualifications of college level personnel not covered by civil service. The Attorney General also advises that no superintendent, teacher, or employee of the educational system has ever been charged with violating § 105, subd. 3. The Court seems to me to be building straw men.

3. The majority also says that no challenge or vagueness points were passed upon in *Adler*. A careful examination of the briefs in that case casts considerable doubt on this conclusion. In the appellants' brief, point 3, in *Adler,* the question is stated in this language: "The statutes and the regulations issued thereunder violate the due process clause of the Fourteenth Amendment because of their vagueness." Certainly the word "subversive" is attacked as vague and the Court finds that it "has a

---

*The Court points to a stipulation of counsel that § 3022 incorporates § 3021 into the Feinberg Law. However, Attorney General Lefkowitz did not sign the stipulation itself, but in an addendum thereto, agreed only that it constituted the *record of fact*—not of law. His brief contends that § 3021 is not incorporated into the law. The legislature, of course, is the only body that could incorporate § 3021 into the Feinberg Law. It has not done so.

very definite meaning, namely, an organization that teaches and advocates the overthrow of government by force or violence." 342 U. S., at 496. Significantly this is the language of subdivisions 1 (a) and (b) which the majority now finds vague, as covering one "who merely advocates the doctrine in the abstract . . ." citing such criminal cases as *Herndon* v. *Lowry*, 301 U. S. 242 (1937), which was on our books long before the *Adler* line of cases. Also significant is the fact that the *Adler* opinion's last sentence is "We find no constitutional infirmity in § 12–a [now subdivisions 1 (a), 1 (b) and 1 (c) of § 105] of the Civil Service Law of New York or in the Feinberg Law which implemented it . . . ." At 496.

## IV.

But even if *Adler* did not decide these questions I would be obliged to answer them in the same way. The only portion of the Feinberg Law which the majority says was not covered there and is applicable to appellants is § 105, subd. 1 (a), 1 (b) and 1 (c). These have to do with teachers who advocate, advise, or teach the doctrine of overthrow of our Government by force and violence, either orally or in writing. This was the identical conduct that was condemned in *Dennis* v. *United States, supra.* There the Court found the exact verbiage not to be unconstitutionally vague, and that finding was of course not affected by the decision of this Court in *Yates* v. *United States,* 354 U. S. 298. The majority makes much over the horribles that might arise from subdivision 1 (b) of § 105 which condemns the printing, publishing, selling, etc., of matter containing such doctrine. But the majority fails to state that this action is condemned only *when and if* the teacher also personally advocates, advises, teaches, etc., the necessity or propriety of adopting such doctrine. This places this subdivision on the same

footing as 1 (a). And the same is true of subdivision 1 (c) where a teacher organizes, helps to organize or becomes a member of an organization which teaches or advocates such doctrine, for scienter would also be a necessary ingredient under our opinion in *Garner, supra.* Moreover, membership is only prima facie evidence of disqualification and could be rebutted, leaving the burden of proof on the State. Furthermore, all of these procedures are protected by an adversary hearing with full judicial review.

In the light of these considerations the strained and unbelievable suppositions that the majority poses could hardly occur. As was said in *Dennis, supra,* "we are not convinced that because there may be borderline cases" the State should be prohibited the protections it seeks. At 516. Where there is doubt as to one's intent or the nature of his activities we cannot assume that the administrative boards will not give him full protection. Furthermore, the courts always sit to make certain that this is done.

The majority says that the Feinberg Law is bad because it has an "overbroad sweep." I regret to say—and I do so with deference—that the majority has by its broadside swept away one of our most precious rights, namely, the right of self-preservation. Our public educational system is the genius of our democracy. The minds of our youth are developed there and the character of that development will determine the future of our land. Indeed, our very existence depends upon it. The issue here is a very narrow one. It is not freedom of speech, freedom of thought, freedom of press, freedom of assembly, or of association, even in the Communist Party. It is simply this: May the State provide that one who, after a hearing with full judicial review, is found to have wilfully and deliberately advocated, advised, or taught that our Government should be overthrown by force or vio-

lence or other unlawful means; or to have wilfully and deliberately printed, published, etc., any book or paper that so advocated *and to have personally* advocated such doctrine himself; or to have wilfully and deliberately become a member of an organization that advocates such doctrine, is prima facie disqualified from teaching in its university? My answer, in keeping with all of our cases up until today, is "Yes"!

I dissent.