Roger A. **MAILLOUX**

v.

Daniel P. **KILEY** et al.

**Civ. A. No. 70–1859.**

United States District Court,
D. Massachusetts.

March 22, 1971.

———◆———

John H. Henn, Foley, Hoag & Elliot, Boston, Mass., for plaintiff.

Kevin M. Keating, Edmund M. Hurley, Crane, Inker & Oteri, Gerard F. Doherty, Boston, Mass., Michael J. Batal, Lawrence, Mass., for defendants.

## OPINION

WYZANSKI, Chief Judge.

This case involves an action by a public high school teacher against the City of Lawrence, the members of its school committee, the superintendent of its schools, and the principal of its high school. Plaintiff claims that in discharging him for his classroom conduct in connection with a taboo word the school committee deprived him of his rights under the First and Fourteenth Amendments to the United States Constitution, and that, therefore, he has a

cause of action [1] under 42 U.S.C. § 1983 within this court's jurisdiction under 28 U.S.C. § 1343(3).

These are the facts as found by this court after a full hearing.

Defendant members of the school committee employed plaintiff to teach in the Lawrence High School for the academic year 1970–1971 at a salary of $8100. Defendant principal assigned plaintiff to teach basic English to a class of about 25 students, boys and girls 16 and 17 years of age, all in the junior class or 11th grade.

Plaintiff assigned to the class for outside reading chapters in a novel, The Thread That Runs So True, by Jesse Stuart. The novel describes an incident based on the experiences of the author as a young country school teacher in rural Kentucky. He had taken over a one-room school in which the class had been seated with boys on one side, and girls on the other side, of the room. He intermingled the sexes for seating. Some parents objected on the ground the new teacher was running a "courting school." Nowhere in the novel is there the word "fuck."

October 1, 1970, during a discussion of the book in class, some students thought the protest against changing the seating in the Kentucky classroom was ridiculous. Plaintiff said that other things today are just as ridiculous. He then introduced the subject of society and its ways, as illustrated by taboo words. He wrote the word "goo" on the board and asked the class for a definition. No one being able to define it, plaintiff said that this word did not exist in English but in another culture it might be a taboo word. He then wrote on the blackboard the word "fuck," and, in accordance with his customary teaching methods of calling for volunteers to respond to a question, asked the class in general for a definition. After a couple of minutes a boy volunteered that the word meant "sexual intercourse." Plaintiff, without using the word orally, said: "we have two words, sexual intercourse, and this word on the board * * * one * * * is acceptable by society * * * the other is not accepted. It is a taboo word." After a few minutes of discussion of other aspects of taboos, plaintiff went on to other matters.

At all times in the discussion plaintiff was in good faith pursuing what he regarded as an educational goal. He was not attempting to probe the private feelings, or attitudes, or experiences of his students, or to embarrass them.

October 2, 1970, the parent of a girl in the class, being erroneously informed that plaintiff had called upon a particular girl in the class to define the taboo word, complained to the principal. He asked Miss Horner the head of the English department to investigate the incident. Plaintiff did admit that he had written on the board the taboo word. He also said he had "probably" called upon a specific girl to define the word. But this court is persuaded by all the testimony that he did not in fact call on any girl individually and that his statement to Miss Horner, repeated later to the union, of what he "probably" did is not an accurate statement of what he actually did. At his meeting with Miss Horner, plaintiff did not refer to the novel which the class had been discussing.

After plaintiff had been interviewed by Miss Horner, defendant superintendent on October 13, 1970 suspended him for seven days with pay.

Plaintiff engaged counsel who requested a hearing before the school committee, and a bill of particulars. The committee furnished particulars alleging that:

"* * * Mr. Mailloux did write a list of words on the chalkboard. One of the words was 'fuck'."

"A female student was asked to define the word 'fuck'."

"When confronted with the incident by the head of the department, Mr.

---

1. Plaintiff abandoned his contract claim.

Mailloux admitted that the incident was true." [This is a reference to the confrontation in Miss Horner's office.]

The committee gave plaintiff and his counsel a hearing on October 20, 1970.

October 21, 1970 the committee dismissed plaintiff on the general charge of "conduct unbecoming a teacher." It made no finding as to any specific particular.[2]

Following his discharge, plaintiff brought this action seeking temporary and permanent relief. After a two day hearing this court, regarding itself as bound by Keefe v. Geanakos, 418 F.2d 359 (1st Cir.), issued on December 21, 1970 a temporary injunction ordering the defendant members of the school committee to restore plaintiff to his employment.

The total amount of salary which, but for his dismissal, plaintiff would have been paid by the City of Lawrence for his services as a teacher at the Lawrence High School from the date of his discharge to the date of his reinstatement by this court is $2,279.20. During that period plaintiff's only earnings were $311.70.

Defendants appealed and asked for a stay pending appeal. For reasons stated in Mailloux v. Kiley, 1st Cir., 436 F.2d 565 (1971), the Court of Appeals denied the stay and dismissed the appeal. This court thereafter conducted a further hearing. Upon the basis of both hearings this court makes the following additional findings.

1. The topic of taboo words had a limited relevance to the Stuart novel which plaintiff's class was discussing, but it had a high degree of relevance to the proper teaching of eleventh grade basic English even to students not expecting to go to college and therefore placed in a "low track."

2. The word "fuck" is relevant to a discussion of taboo words. Its impact effectively illustrates how taboo words function.

3. Boys and girls in an eleventh grade have a sophistication sufficient to treat the word from a serious educational viewpoint. While at first they may be surprised and self-conscious to have the word discussed, they are not likely to be embarrassed or offended.

4. Plaintiff's writing the word did not have a disturbing effect. A class might be less disturbed by having the word written than if it had been spoken. Most students had seen the word even if they had not used it.

5. Plaintiff's calling upon the class for a volunteer to define the word was a technique that was reasonable and was in accordance with customs in plaintiff's class. It avoided implicating anyone who did not wish to participate.

6. The word "fuck" is in books in the school library.

7. In the opinion of experts of significant standing, such as members of the faculties of the Harvard University School of Education and of Massachusetts Institute of Technology, the discussion of taboo words in the eleventh grade, the way plaintiff used the word "fuck," his writing of it on the blackboard, and the inquiry he addressed to the class, were appropriate and reasonable under the circumstances and served a serious educational purpose. In the opinion of other qualified persons plaintiff's use of the word was not under the circumstances reasonable, or appropriate, or conducive to a serious educational purpose. It has not been shown what is the preponderant opinion in the teaching profession, or in that part of the profession which teaches English.

The parties have not relied upon any express regulation of the Lawrence School Committee or the Lawrence High School. The regulations set forth in an attachment to the complaint have no

2. Inasmuch as the committee made no finding as to whether plaintiff called upon a specific girl, this court has no need to consider whether it had substantial evidence which would have supported such a finding.

general or specific provisions relevant to this case.

We now turn to questions of ultimate fact and of law.

Defendant members of the school committee acted for the state when they discharged plaintiff and were therefore subject to the Fourteenth Amendment's command. Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L. Ed.2d 811; Keefe v. Geanakos, 418 F.2d 359, 1st Cir.

■ The Fourteenth Amendment recognizes that a public school teacher has not only a civic right to freedom of speech both outside (Pickering v. Board of Education, *supra*) and inside (See Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731) the schoolhouse, but also some measure of academic freedom as to his in-classroom teaching. Keefe v. Geanakos, *supra*; Parducci v. Rutland, 316 F.Supp. 352, M.D.Ala.

The last two cases cited upheld two kinds of academic freedom: the substantive right of a teacher to choose a teaching method which in the court's view served a demonstrated educational purpose; and the procedural right of a teacher not to be discharged for the use of a teaching method which was not proscribed by a regulation, and as to which it was not proven that he should have had notice that its use was prohibited.

Relying on those cases, plaintiff argues that both his substantive and procedural academic freedom rights, protected by the Fourteenth and First Amendments, were violated by defendant school committee when they discharged him.

The teaching methods plaintiff used were obviously not "necessary" to the proper teaching of the subject and students assigned to him, in the sense that a reference to Darwinian evolution might be thought necessary to the teaching of biology. See the concurrence of Mr. Justice Stewart in Epperson v. Arkansas, 393 U.S. 97, 116, 89 S.Ct. 266, 21 L.Ed.2d 228.

Here we have the use of teaching methods which divide professional opinion. There is substantial support from expert witnesses of undoubted competence that the discussion of taboo words was relevant to an assigned book, and, whether or not so relevant, was at least relevant to the subject of eleventh grade English, that "fuck" was an appropriate choice of an illustrative taboo word, and that writing it on the board and calling upon the class to define it were appropriate techniques. Yet there was also substantial evidence, chiefly from persons with experience as principals but also from the head of the English department at plaintiff's school, that it was inappropriate to use the particular word under the circumstances of this case. The weight of the testimony offered leads this court to make an ultimate finding that plaintiff's methods served an educational purpose, in the sense that they were relevant and had professional endorsement from experts of significant standing. But this court has not implied that the weight of opinion in the teaching profession as a whole, or the weight of opinion among English teachers as a whole, would be that plaintiff's methods were within limits that, even if they would not themselves use them, they would regard as permissible for others. To make a finding on that point would have required a more thorough sampling, especially of younger teachers, than the record offers.

Nor is this case, like *Keefe* or *Parducci*, one where the court, from its own evaluation of the teaching method used, may conclude that, even if the court would not use the method, it is plainly permissible for others to use it, at least in the absence of an express proscription.[3] *Keefe* indicated that the use

---

3. Perhaps, though *Keefe* and *Parducci* do not say so, the school authorities there involved were constitutionally free by express proscription to forbid the assignment of outside reading of magazine articles and novels of undoubted merit and propriety for which the teacher had not secured advance approval.

in the classroom of the word "fuck" is not impermissible under all circumstances—as, for example when it appears in a book properly assigned for student reading. But. a teacher who uses a taboo sexual word must take care not to transcend his legitimate professional purpose. When a male teacher asks a class of adolescent boys and girls to define a taboo sexual word the question must not go beyond asking for verbal knowledge and become a titillating probe of privacy. He must not sacrifice his dignity to join his pupils as "frére et cochon." Here, it should be stated unequivocally, there is no evidence that this plaintiff transcended legitimate professional purposes. Indeed, the court has specifically found he acted in good faith. But the risk of abuse involved in the technique of questioning students precludes this court from concluding that the method was *plainly* permissible. Too much depends on the context and the teacher's good faith.

█ Where, as here, a secondary school teacher chooses a teaching method that is not necessary for the proper instruction of his class, that is not shown to be regarded by the weight of opinion in his profession as permissible, that is not so transparently proper that a court can without expert testimony evaluate it as proper, but that is relevant to his subject and students and, in the opinion of experts of significant standing, serves a serious educational purpose, it is a heretofore undecided question whether the Constitution gives him any right to use the method or leaves the issue to the school authorities. Note, Developments in the Law of Academic Freedom, 81 Harv.L.Rev. 1050, Van Alstyne, The Constitutional Rights of Teachers and Professors, 1970 Duke Law Journal, p. 841.

In support of a qualified [4] right of a teacher, even at the secondary level, to use a teaching method which is relevant and in the opinion of experts of significant standing has a serious educational purpose is the central rationale of academic freedom. The Constitution recognizes that freedom in order to foster open minds, creative imaginations, and adventurous spirits. Our national belief is that the heterodox as well as the orthodox are a source of individual and of social growth. We do not confine academic freedom to conventional teachers or to those who can get a majority vote from their colleagues. Our faith is that the teacher's freedom to choose among options for which there is any substantial support will increase his intellectual vitality and his moral strength. The teacher whose responsibility has been nourished by independence, enterprise, and free choice becomes for his student a better model of the democratic citizen. His examples of applying and adapting the values of the old order to the demands and opportunities of a constantly changing world are among the most important lessons he gives to youth.

4. The so-called constitutional right is not absolute. It is akin to, and may indeed be a species of, the right to freedom of speech which is embraced by the concept of the "liberty" protected by the Fourteenth Amndment. Analytically, as distinguished from rhetorically, it is less a right than a constitutionally-recognized interest. Clearly, the teacher's right must yield to compelling public interests of greater constitutional significance. It may be that it will be held by the Supreme Court that the teacher's academic right to liberty in teaching methods in the classroom (unlike his civic right to freedom of speech) is subject to state regulatory control which is not actuated by compelling public interests but which, in the judiciary's opinion, is merely "reasonable". See Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 and Tinker v. Des Moines School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731. Indeed it has been suggested that state regulatory control of the classroom is entitled to prevail unless the teacher bears the heavy burden of proving that it has no rational justification, (See Mr. Justice Black dissenting in Tinker v. Des Moines School Dist., 393 U.S. 503, 519–521, 89 S.Ct. 733,), or is discriminatory on religious, racial, political, or like grounds. See Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266.

Yet the secondary school situation is distinguishable from higher levels of education. See Note, Developments in the Law of Academic Freedom, 81 Harv.L. Rev. 1045, 1050, 1098. There are constitutional considerations of magnitude which, predictably, might warrant a legal conclusion that the secondary school teacher's constitutional right in his classroom is only to be free from discriminatory religious, racial, political and like measures. Epperson v. Arkansas, *supra*, and from state action which is unreasonable, or perhaps has not even a plausible rational basis. See the concluding words in the penultimate paragraph in Mailloux v. Kiley, 1st Cir., 436 F.2d 565 (1971).

The secondary school more clearly than the college or university acts *in loco parentis* with respect to minors. It is closely governed by a school board selected by a local community. The faculty does not have the independent traditions, the broad discretion as to teaching methods, nor usually the intellectual qualifications, of university professors. Among secondary school teachers there are often many persons with little experience. Some teachers and most students have limited intellectual and emotional maturity. Most parents, students, school boards, and members of the community usually expect the secondary school to concentrate on transmitting basic information, teaching "the best that is known and thought in the world," training by established techniques, and, to some extent at least, indoctrinating in the *mores* of the surrounding society. While secondary schools are not rigid disciplinary institutions, neither are they open forums in which mature adults, already habituated to social restraints, exchange ideas on a level of parity. Moreover, it cannot be accepted as a premise that the student is voluntarily in the classroom and willing to be exposed to a teaching method which, though reasonable, is not approved by the school authorities or by the weight of professional opinion. A secondary school student, unlike most college students, is usually required to attend school classes, and may have no choice as to his teacher.

Bearing in mind these competing considerations, this court rules that when a secondary school teacher uses a teaching method which he does not prove has the support of the preponderant opinion of the teaching profession or of the part of it to which he belongs, but which he merely proves is relevant to his subject and students, is regarded by experts of significant standing as serving a serious educational purpose, and was used by him in good faith the state may suspend or discharge a teacher for using that method but it may not resort to such drastic sanctions unless the state proves he was put on notice either by a regulation or otherwise that he should not use that method. This exclusively procedural protection is afforded to a teacher not because he is a state employee, or because he is a citizen, but because in his teaching capacity he is engaged in the exercise of what may plausibly be considered "vital First Amendment rights." Keyishian v. Board of Regents, 385 U.S. 489, 604, 87 S.Ct. 675, 684, 17 L.Ed.2d 629. In his teaching capacity he is not required to "guess what conduct or utterance may lose him his position," (*Ibid*). If he did not have the right to be warned before he was discharged, he might be more timid than it is in the public interest that he should be, and he might steer away from reasonable methods with which it is in the public interest to experiment. *Ibid.*

In the instant case it is not claimed that any regulation warned plaintiff not to follow the methods he chose. Nor can it be said that plaintiff should have known that his teaching methods were not permitted. There is no substantial evidence that his methods were contrary to an informal rule, to an understanding among school teachers of his school or teachers generally, to a body of disciplinary precedents, to precise canons of ethics, or to specific opinions expressed in professional journals or other publications. This was not the kind of unfore-

seeable outrageous conduct which all men of good will would, once their attention is called to it, immediately perceive to be forbidden. On this last point it is sufficient to refer to the testimony given by faculty members of Harvard University and M. I. T. who had prepared their students for secondary school teaching careers.

Finally, in the face of the record of judicial uncertainty in this case it cannot be held that it was self-evident that a teacher should not have used the methods followed by plaintiff. This Court, perhaps mis-reading the *Keefe* case, issued an injunction on the ground that plaintiff's conduct was, more probably than not, legally permissible. The Court of Appeals, which had before it this court's findings on the temporary injunction (which are not materially different from those now made) concluded that the temporary injunction was not such an abuse of discretion as to justify its dissolution. Mailloux v. Kiley, 1st Cir., 436 F.2d 565 (1971). We can hardly say that plaintiff should have known what was not evident to judges after taking evidence, hearing argument, and reflecting in chambers.

Inasmuch as at the time he acted plaintiff did not know, and there was no reason that he should have known, that his conduct was proscribed, it was a violation of due process for the defendants to suspend or discharge him on that account. Cf. Keyishian v. Board of Regents, Keefe v. Geanakos and Parducci v. Rutland, all *supra*.

Plaintiff, in accordance with Parducci v. Rutland, is entitled to a judgment directing:

1. All defendants to continue plaintiff in employment until the end of the academic year 1970–1971, except for good cause.

2. All defendants to expunge from their employment records and transcripts all references to plaintiff's suspension and discharge.

3. The City of Lawrence, as his employer, and the school committee members, as the persons who discharged him, to compensate him for the salary loss he suffered, $2,279.20, less his earnings, $311.70, or $1,967.50, with 6% interest from the date of the complaint December 14, 1970.

4. The City of Lawrence and the school committee members to pay costs.

The court is not unmindful that both the opinion and the judgment cover not only plaintiff's discharge without compensation but also his suspension with pay. The reason that the suspension is covered is because in the circumstances of this case the superintendent and all others treated it as a penalty. Nothing herein suggests that school authorities are not free after they have learned that the teacher is using a teaching method of which they disapprove, and which is not appropriate to the proper teaching of the subject, to suspend him until he agrees to cease using the method. See the last sentence of Mailloux v. Kiley, 1st Cir., 436 F.2d 565 (1971).