Martha WEBB, Plaintiff,

v.

**LAKE MILLS COMMUNITY SCHOOL DISTRICT et al., Defendants.**

Civ. No. 71–C–2053–C.

United States District Court,
N. D. Iowa, C. D.

May 26, 1972.

Marvin R. Adams and John R. Hearn, Des Moines, Iowa, for plaintiff.

John R. Mackaman and Dwight W. James, Des Moines, Iowa, Richard C. Ramsey, Lake Mills, Iowa, for defendants.

## MEMORANDUM AND ORDER

HANSON, District Judge.

Martha Webb brings this action against the Lake Mills Community School District and the superintendent and the board members of the district, both in their individual and official capacities. Miss Webb alleges that these defendants have acted under color of State law in refusing to allow her to carry out her functions as drama coach pursuant to her employment contract. She alleges that this action by these defendants has violated the constitutional rights guaranteed her by the Fourteenth and First Amendments to the Constitution of the United States. The suit is based upon 42 U.S.C., Section 1983, the Civil Rights Act of 1871; the Court has jurisdiction over the subject matter of this action by reason of 28 U.S.C., Section 1343(3).

Miss Webb seeks a permanent injunction from the Court barring the defendants from interfering with her activities as drama instructor at Lake Mills High School, and from refusing to permit her to conduct, coach and head the dramatics activities at the school. She further prays that the defendants be required to place all high school plays under her immediate supervision, direction and control, and that they be required to grant her the increments in salaries that would have been hers had the Board adhered to the salary schedule they have established. She also seeks back pay she has lost. She further seeks damages of $30,000 for lost reputation and for mental pain and anguish. Finally, she seeks her reasonable attorneys fees and court costs.

In addition to generally denying the allegations of the complaint, the defendants assert that the Court lacks subject matter jurisdiction over plaintiff's complaint, that the plaintiff's complaint fails to state a claim upon which relief can be granted, and that plaintiff has failed to join an indispensible party.

The Motion for Temporary Injunction in this matter was heard on October 13, 1971. The Motion was denied in an Order filed January 14, 1972. This matter came on for trial on February 2, 1972. From all of the evidence heard in this case the Court finds the following facts:

## FINDINGS OF FACT

1. The plaintiff, Martha Webb, and all of the individual defendants are citizens of the United States of America and are residents of Winnebago County, Iowa. Defendant Lake Mills Community School District is a public school district organized and existing under the laws of the State of Iowa and accredited by the Department of Public Instruction for the State of Iowa. Defendants Harris Honsey, Stanley Helgeson, Dr. C. S. Nelson, Clarence Willand, and Gordon Anderson are each members of the Board of Directors of the Lake Mills Community School District and collectively constitute the entire Board of Directors of that school district. Defendant Burton Mitchell is superintendent of Schools of the Lake Mills Community School District.

2. In May, 1969, Miss Webb was employed as a school teacher by the Lake Mills Community School District for the school year 1969–70. She was assigned as instructor in Junior High School English for that term, which duties she satisfactorily performed.

3. Towards the end of the 1969–70 term, Miss Webb informed Principal Raymond Six that she was interested in teaching Ninth Grade English, a position then open for the 1970–71 term. Principal Six stated that the Ninth Grade English position was to be assigned only to a person also willing and qualified to coach high school drama. Negotiations subsequently took place between Miss Webb and Superintendent Mitchell and Principal Six. One concern of the administration was that Miss Webb become certified with the State Department of Public Instruction to teach dramatics. Miss Webb indicated that she would attend summer classes in dramatics at a university to enable her to secure certification. A further concern of Superintendent Mitchell and Principal Six was

that the plays produced by Miss Webb not contain profanity, drinking, or other depictions distasteful to the public. The precise nature of the agreement with respect to this item between Miss Webb and the administration is the central factual issue of this lawsuit.

4. Testimony of the various board members indicates that the Board did have some vague and generally unarticulated policy concerning profanity and drinking in school sponsored activities. With respect to the use of profanity or drinking scenes in public dramatic productions, most board members felt that at some time they had discussed the matter and that they had generally agreed that profanity and drinking on stage should not be allowed. No board member could recall clearly when the matter had been discussed and the Board Minutes do not reflect any record of such a discussion prior to the Martha Webb incident. The rules and regulations of the school promulgated by the Board and in effect at the time Miss Webb agreed to become drama coach did not contain a specific policy on the use of profanity and drinking scenes in plays. The Board did not meet with Miss Webb to discuss her employment as drama coach. All discussions over this job were between Miss Webb and Superintendent Mitchell and Principal Six.

5. During the school year 1969-70, the school produced the plays "Brigadoon" and "I Remember Mama." "Brigadoon" contained scenes in which a drunk appeared and drank to excess on stage. "I Remember Mama" contained a scene in which an old man taught a nine-year-old boy to swear in order to relieve the boy's pain from a knee operation. The swear words consisted of "damn" and "damn it to hell." The plays contained many other irreverent references to the deity. Some of the citizenry objected to the immoral nature of these scenes; the drama coach was criticized for producing these objectionable plays. Miss Webb was aware of these productions and the criticism they generated. The drama coach was not fired, but resigned at the end of the school year for reasons not related to these productions.

6. During the Spring, 1970, negotiations with Miss Webb about the drama coach job for 1970-71, Superintendent Mitchell and Principal Six told Miss Webb that they did not want drinking and profanity in high school plays. Miss Webb believes that the discussion was with reference to the kind of profanity and drinking found in "Brigadoon" and "I Remember Mama." Superintendent Mitchell and Principal Six believe they said that absolutely no drinking or swearing was to be shown in plays before the public, but they do not remember exactly what they said. They testified that the discussion may have had reference to the plays produced in 1969-70. The Court finds that the rule with respect to this matter given to Miss Webb by Superintendent Mitchell was not a precise one, but was rather ambiguous. There is no writing showing what the precise nature of the rule was. Miss Webb entered into the drama coach job with the understanding that unnecessary and excessive drinking and vulgarity, such as was contained in "Brigadoon" and "I Remember Mama", were not to be contained in plays performed before the public. There was no discussion about whether profanity and simulated drinking could take place in play rehearsals. Superintendent Mitchell also told Miss Webb that she would be required to present a synopsis of all plays to the administration prior to his ordering them.

7. There has never been a policy in the Lake Mills Schools concerning the use or discussion of materials containing profanity, vulgarity, or drinking by teachers in the classroom. The school library contains books with much more profane and vulgar material than any material ever presented on stage at Lake Mills. These books can be and are assigned and read by students in the school.

The play "I Remember Mama" was read and discussed by a seventh grade class with the apparent approval of the

administration. Superintendent Mitchell stated that he would have no objection to the reading and discussion in the classroom of the plays produced by Miss Webb during the 1970–71 term. Any prohibition against profanity and drinking, simulated or otherwise, in the Lake Mills Schools apparently is with respect to public utterances and acts only.

8. In 1969, the Lake Mills Schools and Miss Webb entered into a continuing contract for teaching services. This contract can be modified yearly to provide for such things as a different salary or a change in teaching duties. On April 27, 1970, Miss Webb and the Lake Mills Schools entered into an "Agreement to Modify Teacher's Continuing Contract." This agreement provided for a salary of $7,004.00 and the assignment of Miss Webb as instructor in high school English. In the left hand margin of this agreement are the words: "If college work is obtained in Dramatics and Dramatics is added to the contract, the salary will be $7412."

9. During the summer of 1970, Miss Webb successfully completed six semester hours of course work in dramatics at the University of Iowa. Miss Webb was the drama coach at Lake Mills Schools during the 1970–71 term. She coached the junior class play, two one-act plays, the senior class play, the freshmen students who participated in the state speech competition, and the school's entry in the state large group dramatics competition. She was also second in charge of the high school speech department.

10. In the fall of 1970, Miss Webb chose "The Haunting of Hill House" for the junior class play. She presented a synopsis of this play to the administration, and sometime prior to the performance of the play, she met with Superintendent Mitchell and Principal Six to discuss some drinking scenes in the play. "The Haunting of Hill House" concerns itself with the supernatural and ends with one of the principals being the fatal victim of supernatural forces. The play as written contains some scenes depicting repetitive drinking (one of the characters is a rather heavy drinker), some dialogue which could be frightening to small children, some dialogue about possible criminal acts, and some dialogue containing language which could be considered vulgar or at least not suitable to be uttered before small children. Sometime prior to public performance of the play, Miss Webb either deleted or suitably modified all of these potentially offensive passages except two. She left one passage in which the principal characters drank a toast of welcome to the haunted house to ease their nerves, and another in which the same people drank a shot of brandy after several shocking supernatural phenomena had occurred. Before the performance, however, Miss Webb discussed performing these scenes with Superintendent Mitchell and Principal Six. Superintendent Mitchell told Miss Webb that his feeling was that the scenes probably should be omitted, but that she should exercise her own judgment as to whether the scenes were necessary and whether the plays would be presentable with those scenes excluded. Miss Webb decided that the scenes were necessary for proper dramatic effect and that the play would conform with Superintendent Mitchell's rule with respect to drinking scenes in high school plays. The Court finds that the play did not violate the rule as Miss Webb understood it. The actors actually used tea on stage; alcoholic beverages were never used in the rehearsals or in the performances, which occurred on November 13, 1970. Superintendent Mitchell attended a performance of "The Haunting of Hill House." He testified that he felt at the time that the drinking scenes violated the rule he had stated to Miss Webb. He, however, did not mention this to Miss Webb until after the performance of the one act plays in January of 1971.

11. Later in the winter Miss Webb selected two one-act plays which were to be performed in the latter part of January of 1971. The plays were entitled "Bridges . . . Are When You Cross Them" and "The Great Choice." "Bridg-

es" concerns itself with the problems an independent thinking teenage girl has in coping with her "typical" American family. The controversial scenes in this play involve the situation in which the father, after reaching his saturation point of frustration over the odd ideas of his daughter, feels that he must swear in order to relieve his frustration. Before swearing, however, he orders his family into the bedroom so they cannot hear him. At one point in the play he utters "damn", and at another point, when extremely frustrated, he utters "son of a bitch." The family, of course, hears him; hence, the supposed comedy of the scene. Miss Webb allowed the play to be rehearsed with these words, but changed "damn" to "darn" and "son of a bitch" to "son of a gun" and then, at the students' request, to "son of a biscuit" a week prior to the public performance. The play was performed using this modified script. One night during rehearsals, while "son of a bitch" was still being used, Superintendent Mitchell walked past the open auditorium doors. He heard the offending phrase, "son of a bitch", ring out from the stage. This annoyed and disturbed him, but he did not approach Miss Webb until after the matinee performance of the one-act plays on January 27, 1971.

12. The other one-act play, "The Great Choice," had as its subject matter the United States under martial law during World War III and a citizen's conflict between duty to God and duty to country. Several times in the play various characters invoked the deity in prayerful, but forceful, manner.

13. In the afternoon of January 27, after the dress rehearsal-matinee, Superintendent Mitchell approached Miss Webb in the hallway. He had received a complaint from a certain unnamed elementary teacher that the students in the plays that afternon had taken the Lord's name in vain and has used other profanity—in particular "son of a biscuit," which the teacher felt was "too close to the real thing. The teacher complained to Superintendent Mitchell that

such language was unfit for her elementary students to hear. Superintendent Mitchell had not attended the afternoon performance. In the hallway, he criticized Miss Webb severely for not following the rules they had previously established. He further told Miss Webb that she had violated his rule with respect to "The Haunting of Hill House." He ended the conversation by stating that she could not be trusted to properly carry out her duties as drama coach. At Superintendent Mitchell's request, Miss Webb changed "son of a biscuit" to "son of a gun" for the public performance of "Bridges."

14. The two one-act plays were performed in the main by members of the junior and senior classes, with a few sophomores participating. None of the students or their parents complained about the material contained in any of the three plays discussed above. In fact, from the evidence in the case, the only complaint about the plays anyone could remember as specifically coming from the public was the complaint of the unnamed elementary teacher. The defendants do not complain that the plays in general were unsuitable for performance by students of upper high school level; rather they complain only of particular small passages in the scripts of the plays as not conforming to Lake Mills community standards of morality.

15. On March 10, 1971, Principal Six informed Miss Webb that Superintendent Mitchell intended to replace her as drama coach because of the drinking and profanity in her plays. Miss Webb confronted Principal Six on March 12 and told him that she was not going to let this happen. On Monday, March 15, 1971, Superintendent Mitchell called Miss Webb into his office to inform her that she would not have the dramatics job at Lake Mills for the 1971–72 term. He told her that she had been completely inadequate in fulfilling her drama duties in that she had gone against everything that he had said. The sum and substance of her disobedience was with respect to the play passages which Su-

perintendent Mitchell deemed as being not in accord with his profanity instructions. He further told Miss Webb that he had already hired a replacement for her and that she had no right to appear before the board to discuss the matter because the board knew about her case and had approved Mitchell's actions. Miss Webb then contacted representatives of the Iowa State Education Association (ISEA), the state teachers' organization. The ISEA apparently expressed some concern about the matter to Superintendent Mitchell, and subsequently Miss Webb was told that she could meet with the Board on April 12.

16. Sometime prior to the April 12 meeting Miss Webb was tendered a new contract modification agreement stating that she would be assigned only Ninth Grade English duties, but with the usual annual salary increment for teachers at Lake Mills. Miss Webb did not sign and has not signed this contract modification to date.

17. The day before the April 12 meeting with the Board, Miss Webb told her students that the meeting was to take place. She asked students to encourage parents with views either way on the matter to attend the meeting and express their views. She discouraged students from attending. The students came to the meeting anyway, but were orderly for the most part, with only one student making a discourteous remark to a board member. A local minister expressed his view to the Board that their actions with respect to Miss Webb constituted unbridled censorship. Other citizens spoke before the Board, two in support of the Board's position, and the rest in support of Miss Webb. The Board went into closed session after hearing the public. The Board never formally voted on Miss Webb's termination as drama coach, but the members all testified that they supported Superintendent Mitchell's decision. None of the individual board members had personal knowledge of what Miss Webb had done and none had personally received any complaints from the public concerning Miss Webb. The members testified in court that, although they found some of the passages in the plays offensive, they would have followed Superintendent Mitchell's decision not to terminate Miss Webb as drama coach, had he so decided. They decided to support Superintendent Mitchell's decision to terminate solely because that was what their superintendent had decided was the proper thing to do. All board members agreed that the predominant reason for Miss Webb's termination was that she disobeyed Superintendent Mitchell's instructions and thus created intolerable disorder in the school. Both the Superintendent and the Board agreed that Miss Webb's violation of school rules was not flagrant enough to warrant complete dismissal; hence, the decision to keep her on as English teacher. Neither the Board or Superintendent Mitchell has ever questioned Miss Webb's competency and effectiveness as a drama coach or as an English teacher.

18. On April 13, the day following the Board meeting, many students boycotted classes in protest to the Board's handling of Miss Webb. Miss Webb did not encourage the walkout. At first she warned the students of their duties as responsible individuals; later she told them that they belonged in school and were not accomplishing anything constructive by their walkout. Later the Board met with four student representatives, Miss Webb, and her attorney, but took no further action with respect to Miss Webb's termination as drama coach.

19. Miss Webb coached the senior class play in the spring of 1971. There was no complaint about that play.

20. In August of 1971, the ISEA told Miss Webb and Lake Mills school officials that it would provide legal assistance to Miss Webb to enable her to sue for her reinstatement. The Board then told the ISEA and Miss Webb that they would discuss Miss Webb's situation at the September 17 meeting. The Board took no further action and this lawsuit was instituted in October of 1971.

21. Miss Webb is receiving the same salary for the term 1971–72 that she did

for the term 1970–71, i. e., $7412.00. Had she received the usual salary increment for the English teacher-drama coach position, her salary for 1971–72 would have been $7797.00.

22. Miss Webb is performing duties as high school English teacher for Lake Mills Schools during the 1971–72 term. She has not seriously looked for another job as drama coach with another school district. She has made a few inquiries, but no jobs were available. There is no evidence before the Court that any school district has refused Miss Webb a position as drama coach because of the Lake Mills problem.

## I.

■ The defendants acted for the state when they discharged Miss Webb from her drama coaching job and are therefore subject to the Fourteenth Amendment's command. Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Moore v. Board of Education, 448 F.2d 709 (8th Cir. 1971); Hegler v. Board of Education, 447 F.2d 1078 (8th Cir. 1971).

■ Courts have recognized that under the Fourteenth Amendment a public school teacher has not only a civic right to freedom of speech both outside, Pickering, supra, and inside, Tinker v. Des Moines Independent Comm. School Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), the school house, but also some measure of academic freedom in the classroom as well. Bartels v. Iowa, 262 U.S. 404, 43 S.Ct. 628, 67 L.Ed. 1047 (1923); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); Keefe v. Geanakos, 418 F.2d 359 (1st Cir. 1969); Mailloux v. Kiley, 323 F.Supp. 1387 (D.Mass.1971); Parducci v. Rutland, 316 F.Supp. 352 (M.D.Ala. 1970). See Tinker, supra.

Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed. 2d 629 (1967), describes the Constitutional guarantee surrounding classroom activity of teachers in the following terms:

"Our Nation is deeply committed to safeguarding academic freedom, which is of transcendant value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. . . . The classroom is peculiarly the 'marketplace of ideas.' "

Although Keyishian is concerned with college teachers, the rationale must extend to high school and even elementary teachers. The state interest in limiting the discretion of teachers grows stronger, though, as the age of the students decreases; thus, the Fourteenth and First Amendments do not necessarily give teachers of younger students the same "academic freedom" that they give to teachers of college students. See Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).

■ With respect to the academic freedom of teachers of high school students of the age of those involved in the instant case, federal courts dealing with the subject have upheld two kinds of academic freedom: the substantive right of a teacher to choose a teaching method which in the court's view served a demonstrated educational purpose; and the procedural right of a teacher not to be discharged for the use of a teaching method which was not proscribed by a regulation, and as to which it was not shown that the teacher should have had notice that its use was prohibited. Keefe, supra; Mailloux, supra; Parducci, supra. The Court of Appeals for the Eighth Circuit has simply declared, in cases of this nature, that the actions of school officials shall not be arbitrary and capricious. McConnell v. Anderson, 451 F.2d 193 (8th Cir. 1971), cert. denied, 405 U.S. 1046, 92 S.Ct. 1312, 31 L.Ed.2d 588 (1972). In the Court's mind, this articulation of the Eighth Circuit means much the same as the articu-

lation in *Keefe, Mailloux,* and *Parducci.* *See* Mailloux v. Kiley, 436 F.2d 565 (1st Cir. 1971); Close v. Lederle, 424 F.2d 988 (1st Cir. 1970).

## II.

Defendants assert that the Lake Mills School Board had promulgated a rule proscribing profanity or drinking scenes in school-sponsored plays produced for the public on the school stage. They allege that Miss Webb had notice of the rule and violated it by producing plays containing profanity and drinking scenes. Defendants further contend that, irrespective of the rule, Miss Webb agreed with Superintendent Mitchell not to produce plays containing profanity and drinking scenes. This agreement, they allege, was part of her contract, which agreement she subsequently disregarded. Hence, defendants claim that Miss Webb breached her employment contract.

The preponderance of the evidence before the Court indicates that the "rule" Superintendent Mitchell announced to Miss Webb was as Miss Webb remembers it and not as Superintendent Mitchell remembers it. The Court must initially consider the circumstances surrounding the discussions between Miss Webb and Superintendent Mitchell and Principal Six. The plays "Brigadoon" and "I Remember Mama" were the topic of the day in the school and the community. It is not unreasonable to believe Miss Webb's testimony that the discussion about profanity and drinking in plays centered around the plays produced in the 1969–70 term. Superintendent Mitchell and Principal Six testified that the plays could have been discussed in their conversations with Miss Webb, although they do not remember mentioning them in the discussion. Subsequent events, however, indicate more strongly that the rule Superintendent Mitchell declared to Miss Webb was that profanity and drinking in plays produced during the 1970–71 term should not be as conspicuously evident as they were in "Brigadoon" and "I Remember Mama." Superintendent Mitchell was aware of the intention of

Miss Webb to allow the two cocktail scenes in "The Haunting of Hill House." He and Miss Webb discussed the matter and he told her to use her discretion, but to conform the scenes to the rule. If the rule had been an absolute prohibition against any drinking scenes, as Superintendent Mitchell remembers it, he would never have said, "Use your own judgment." Superintendent Mitchell saw the play, but said nothing about the drinking to Miss Webb for two months.

Defendants assert that Miss Webb was contractually bound to the rule as Superintendent Mitchell stated it. The written agreement between Miss Webb and the Board mentions nothing about profanity and drinking in plays. Defendants correctly assert, however, that the written contract is not the complete or integrated agreement of the parties, and that, therefore, the Court must examine matters outside of the written agreement to determine the whole agreement between the parties. 32A C.J.S. Evidence § 1013(1). There is a disagreement between the parties with respect to the agreement between Miss Webb and Superintendent Mitchell about the performance of plays containing profanity or drinking scenes. Three rules of construction of contracts control in a situation such as the present one, where there is some uncertainty about what the agreement actually was. First, in construing an oral contract, courts must take into consideration the circumstances surrounding both parties at the time the contract was made. Gildner Bros. v. Ford Hopkins Co., 235 Iowa 191, 16 N.W. 2d 229 (1944). The circumstances at the time of the agreement between Miss Webb and Superintendent Mitchell indicate that the concern of Superintendent Mitchell was that vulgarity to the degree of that produced on stage during the 1969–70 term not be allowed. Second, a contract is strictly construed against the party stating the terms which are ambiguous. *E. g.,* Archibald v. Midwest Paper Stock Co., 176 N.W.2d 761 (Iowa, 1970); Walnut Street Baptist Church v. Oliphant, 257 Iowa 879, 135 N.W.2d 97

(1965); Freese v. Town of Alburnett, 255 Iowa 1264, 125 N.W.2d 790 (1964); Pazawich v. Johnson, 241 Iowa 10, 39 N.W.2d 590 (1949). Here Superintendent Mitchell stated the terms of the agreement concerning the use of profanity and drinking in the plays; by his own admission the terms could have been interpreted as Miss Webb interpreted them. Iowa law, therefore, dictates that Miss Webb's interpretation must be the correct one. Third, the practical construction given the ambiguous terms of an agreement will usually be adopted by the courts. *E. g.*, Goering v. Jefferson, 159 N.W.2d 409 (Iowa, 1968); Keding v. Barton, 261 Iowa 327, 154 N.W.2d 172 (Iowa, 1967); Hamilton v. Wosepka, 261 Iowa 299, 154 N.W.2d 164 (Iowa, 1967). The conduct of both Miss Webb and Superintendent Mitchell with respect to the drinking scenes in "The Haunting of Hill House" indicates that Miss Webb's interpretation of the agreement was the interpretation the parties lived by, at least until January of 1971 when Superintendent Mitchell decided that the agreement prohibition should be stricter. When all of these rules of contract law are taken in aggregate, the Court must conclude that the agreement with respect to profanity and drinking in plays was as Miss Webb interpreted it, and that Miss Webb did not in fact violate that agreement.

Moving now to defendants' contention that an absolute rule against any profanity or drinking scenes in plays produced for the Lake Mills Schools was in effect at the time Miss Webb agreed to become drama coach, the Court will assume for the moment that such a rule was duly promulgated by the Board in accordance with Iowa law and its own by-laws. The board members could not recall any specific discussions about such a rule; the Minutes of the Board do not reflect that the Board ever passed such a rule. Nevertheless, Superintendent Mitchell announced to Miss Webb a rule with respect to profanity and drinking scenes in plays. The Court finds that Superintendent Mitchell's statement of the rule was vague and ambiguous; "profanity" and "drinking" have different meanings to different people. Especially considering the context of the discussion between Miss Webb and Superintendent Mitchell, Superintendent Mitchell could not but have been aware that a rule absolutely prohibiting profanity and drinking scenes could easily be subject to misinterpretation unless stated clearly. The Board and Superintendent Mitchell state that the rule has been in effect for many years at Lake Mills. He conveyed this impression to Miss Webb. The plays "Brigadoon" and "I Remember Mama" produced just prior to the discussions violated the rule, but the drama coach was not terminated as a result. Thus, Miss Webb could easily assume that those plays, although being in violation of the rule, were not in flagrant violation, and that her plays should maintain a standard of decency somewhat higher than that contained in those plays. Miss Webb's job as drama coach was terminated because she failed to obey the rule under discussion. It is the prevailing law of the land that no person shall be punished for conduct unless such conduct has been proscribed in clear and precise terms. *See* Connolly v. General Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). This is especially true when the conduct involves First Amendment rights, such as in the instant case. NAACP v. Button, 371 U.S. 415, 432, 83 S.Ct. 328, 9 L.Ed. 2d 405 (1963); Winters v. New York, 333 U.S. 507, 509–510, 68 S.Ct. 665, 92 L.Ed. 840 (1948). The Court need not reach the question of whether the rule stated by Superintendent Mitchell was constitutionally invalid; it suffices to say that the rule must be construed as narrowly as possible. Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970). The narrow construction given the rule by Miss Webb was a reasonable construction under the circumstances. The Court concludes that Miss Webb's statement of the rule gives the true legal meaning of the rule. None of Miss Webb's plays, as produced on stage, violated this rule.

The Court is not saying that the School Board cannot prohibit the use of vulgar speech and mannerisms in school-sponsored plays on its stage. Social acceptable speech and conduct are proper concerns of our elementary and secondary schools. Small children are in attendance at the school plays produced at Lake Mills; the Board has a legitimate concern that they not be subjected to vulgarity emanating from the stage of the school. The Board, moreover, has a legitimate concern about the reputation of the school; vulgar speech and conduct performed on the school state during a school-sponsored play could well suggest to the public that the school is doing an inadequate job of imparting principles of socially acceptable speech and conduct to the students. *See* McConnell v. Anderson, *supra.* This does not mean that the Board or any other arm of the State can regulate profanity as such, for "profanity" is legally very closely related to "blasphemy." 12 Am.Jur.2d, Blasphemy and Profanity, Section 10. State regulation of "profanity" may well be in collision with Establishment of and Free Exercise of Religion Clauses of the Constitution. *See* State v. West, 9 Md.App. 270, 263 A.2d 602, 41 A.L.R.3d 512 (1970). The Court takes no position with respect to state regulation of "profanity".

### III.

Drama coaching in public high schools in Iowa is characterized by Iowa law as a classroom activity. An accredited Iowa high school must offer dramatic activities to its students and must hire a teacher certified by the Department of Public Instruction to coach drama.[1] The facts that most dramatic activity is conducted after school hours, that students are not graded for their dramatic capabilities, and that students are not required to participate in drama do not detract from the conclusion that a drama coach performs academic, classroom-type duties.

Lake Mills Schools have no regulation with respect to discussion of profanity or vulgarity in the classroom. Superintendent Mitchell testified that Miss Webb would not have been fired had she discussed the words found in her plays in the classroom.

The Court has no Board findings or reasons in support of Miss Webb's termination before it. In fact, testimony of the board members indicates that they never even officially voted to terminate

---

1. Iowa Code Section 280.17 provides in part:
   "The board [of directors of the school] may establish graded and high schools and determine what branches shall be taught therein, but the course of study shall be subject to the approval of the state board of public instruction."
   The Rules of the Department of Public Instruction are set out in Iowa Departmental Rules, p. 386 et seq. (1966).
   Rule 3.50 (257) provides in part:
   "Each school district maintaining elementary and secondary schools through grade twelve, and community or junior colleges, if operated, shall provide a program of pupil activities sufficiently broad and varied to offer opportunity for all pupils to participate. The activity program shall be co-operatively planned by pupils and teachers and be supervised by qualified school personnel . . . ."
   Iowa Departmental Rules at 395 (1966).
   Rule 3.55 (257) provides in part:

   "[T]he senior high school shall provide an activities program based on mutual as well as individual pupils needs, interests, abilities and enthusiasms. The program shall be so organized and administered that broad and varied experiences will be available which will contribute to the enrichment of the total educational program. Opportunities in the following areas shall be provided: . . . speech activities and dramatics . . . . ."
   Iowa Departmental Rules at 396 (1966).
   Rule 19.10 (257) provides in part:
   "The department of public instruction makes no distinction for approval purposes between physical education and athletics; between curricular and extra-curricular activities; or between credit and noncredit courses. If the teacher directs pupils in any part of the school program, it is assumed that he is paid for such service and he must meet approval standards."
   Iowa Departmental Rules at 424 (1966).

Miss Webb as drama coach, but rather ratified Superintendent Mitchell's decision by their tacit acquiescence. Thus, this Court cannot merely look for substantial evidence to support the Board's decision, for the Board made no formal decision. *See* McConnell v. Anderson, *supra.*

All board members testified that they approved of Miss Webb's termination as drama coach because she had disobeyed Superintendent Mitchell. The Court finds no substantial evidence that Miss Webb ever disobeyed Superintendent Mitchell; rather, she made a conscientious, good faith effort to follow his wishes. Miss Webb at no time told Superintendent Mitchell that because of her conscience and professional ideals, she would not obey a rule with respect to vulgarity, either on stage or in the classroom. Superintendent Mitchell's desires were simply not articulated well enough for Miss Webb to properly understand them.

■ The Court has already concluded that Miss Webb violated no rule of the Lake Mills Schools. Nevertheless, she did allow the terms "son of a bitch" and "damn" to be used in rehearsals. The Court finds that Miss Webb was in good faith in allowing this language in the rehearsals and that she believed that the use of the words, in the context in which they were spoken, had a legitimate, good faith purpose in imparting knowledge of drama to her students. The defendants have made no effort to deny that the use of the words in context were in accord with legitimate, good faith teaching practices, their contention being that drama coaching is not a classroom activity, and that, therefore, the concept of "academic freedom" has no application. The Court will not hold, just from the testimony of Miss Webb, however that the use of such vulgarity as "son of a bitch" or "damn" is so necessary to the proper teaching of drama that a formal or informal regulation proscribing its use would be repugnant to the Constitution.

The Supreme Court of the United States has found proscriptions against the teaching of foreign languages in public schools, Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); Bartels v. Iowa, 262 U.S. 404, 43 S.Ct. 628, 67 L.Ed. 1047 (1923); and against teaching the theory of evolution, Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); to be repugnant to the Constitution because the teaching of these matters are legitimate academic concerns and there is no compelling state interest dictating that they not be taught. In the instant case there is no proof that the use of vulgar terms is a legitimate academic concern; no case has ever held that vulgarity is a legitimate academic concern. *See* Mailloux v. Kiley, 323 F.Supp. 1387 (D.Mass. 1971). And there is at least some legitimate state interest in prohibiting the teaching and use of vulgarity in secondary public schools. *See* Section II *supra.* The Court finds that the use of "son of a bitch" and "damn" in rehearsals did have relevancy to the proper teaching of drama, although the use of the terms is not at all essential to the proper teaching of drama.

The Court notes that no student or parent complained about the use of "son of a bitch" or "damn" in rehearsals, although the terms were used for a number of weeks. Defendants agree that Miss Webb's students have heard the terms often during their lives and that the terms are used commonly in Lake Mills, although perhaps not to the liking of some or even a majority of the residents. The only person offended by the use of the terms in rehearsal was Superintendent Mitchell. He felt that their use was improper, but only because of the possibility that small children could overhear them. He testified that the kindergarten classroom is near the auditorium in which the rehearsals took place, that the public is allowed to attend the rehearsals, and that students are sometimes in the building after hours when the rehearsals usually take place. There is no evidence, however, that small children were ever

in or near the auditorium when the rehearsals for "Bridges" occurred. And Superintendent Mitchell apparently was not overly concerned about the words in the rehearsals; when he heard "son of a bitch" he did not walk into the auditorium and tell Miss Webb to disallow the use of the term; he did not even shut the doors of the auditorium as a precaution against small children, wandering through the school halls at night, hearing the word.

Miss Webb allowed nothing in her plays or rehearsals that is so inherently repugnant to good teaching practices or to community standards of decency that she should have known that such activity was unequivocally not in the best interests of the Lake Mills Schools; that is, so much so that she would automatically lose her job.[2] In two instances, occurring in the school terms 1969–70 and 1970–71, teachers had either uttered vulgarity or allowed vulgarity in public, school-sponsored activities, and had not lost their jobs for it. One instance involved the drama coach for 1969–70, and the other, the basketball coach for 1970–71. The school library is replete with books containing vulgarity far more extreme than any vulgarity uttered or performed under Miss Webb's supervision; these books can be freely assigned to and read by high school students. Superintendent Mitchell testified that teachers in the Lake Mills High School can and have assigned and discussed materials containing vulgarity.

Courts have held that a teacher cannot be discharged from using a method relevant to the proper teaching of the subject matter involved unless the state, or arm thereof, proves that he was put on notice either by regulation or otherwise that he should not use that method. Keefe v. Geanakos, 418 F.2d 359 (1st Cir. 1969); Parducci v. Rutland, 316 F. Supp. 352 (M.D.Ala.1970); Mailloux v. Kiley, 323 F.Supp. 1387 (D.Mass.1971). Mailloux v. Kiley, 323 F.Supp. at 1392, reasons:

> "This exclusively procedural protection is afforded to a teacher not because he is a state employee, or because he is a citizen, but because in his teaching capacity he is engaged in the exercise of what may plausibly be considered 'vital First Amendment rights.' Keyishian v. Board of Regents, 385 U.S. 589, 604, 87 S.Ct. 675, 684, 17 L.Ed.2d 629. In his teaching capacity he is not required to 'guess what conduct or utterance may lose him his position.' Ibid. If he did not have the right to be warned before he was discharged, he might be more timid than it is in the public interest that he should be, and he might steer away from reasonable methods with which it is in the public interest to experiment. Ibid."

Miss Webb's plays were in conformity with the rules stated to her by Superintendent Mitchell. She was not given any notice that she would be fired for allowing vulgarity to be used in rehearsals. All circumstances indicated that such actions on her part would be permissible. After considering the total circumstances surrounding Miss Webb's termination as drama coach, this Court concludes that the action of the defend-

2. Federal courts have found certain activities of teachers so repugnant and contrary to the best interests of the institution that a teacher should know what he was doing was wrong. These cases fall into two basic categories: (1) Cases in which the teacher used his position with the school to proselyte views in public on issues in which the school should remain neutral; Long v. Board of Education, 456 F.2d 1058 (8th Cir. 1972); McConnell v. Anderson, 451 F.2d 193 (8th Cir. 1971), cert. denied, 405 U.S. 1046, 92 S.Ct. 1312, 31 L.Ed.2d 588 (1972); and, (2) cases in which the teacher was teaching matters not within subject area he was supposed to be teaching. Ahern v. Board of Education, 456 F.2d 399 (8th Cir. 1972). This instant fact situation reflects no act by Miss Webb that falls within the categories just described, that is, activity so apparently contrary to the best interests of the school that she could not but know that she was doing wrong.

ants was arbitrary, capricious, and unreasonable. Miss Webb was not insubordinate, and the defendants admit that she is a good teacher; indeed, she is still employed by the defendants as English teacher, and was offered for 1971–72 the ordinary increment awarded teachers whose performance has been satisfactory. Miss Webb's character is good and she has not caused disruption to the affairs of the school. Indeed, the only disruption shown in the evidence was precipitated by the defendants' own actions.

All evidence before this Court indicates that Miss Webb was fired[3] in direct reprisal to her proper exercise of academic freedom—her freedom to employ methods of teaching reasonably relevant to the subject matter she was employed to teach. Although the defendants would be justified in proscribing all vulgarity in the classroom or on the stage, they did not give adequate notice to Miss Webb that they had done so; the circumstances led Miss Webb to believe that they had not done so. The termination of Miss Webb without giving her prior notice that the teaching method she employed was not allowed denied her due process of law, and cannot but have had a chilling effect upon the academic freedom of Miss Webb and the other teachers of Lake Mills to innovate and to develop new and more effective teaching methods which are reasonably relevant to the subject matter they are assigned to teach.

### IV.

Because the Court concludes that Miss Webb's constitutional rights have been violated by the defendants while acting under color of State law, permanent injunctive relief may properly issue under 42 U.S.C., Sections 1983 and 1988. This injunction shall order Miss Webb's reinstatement as drama coach with all rights and privileges appurtenant thereto, including all increments in salary awarded to persons satisfactorily performing their teaching duties.

Defendants assert that the Court cannot reinstate Miss Webb as drama coach because the present drama coach, Karen Koch, is an indispensible party, under F.R.Civ.P. 19, to such an order, and Miss Koch has not been named as a defendant to this action. The Court concludes that Miss Koch is not an indispensible party to this action. The Court is not ordering that Miss Koch not be allowed to coach drama. Rather, it appears to the Court that as a result of its order reinstating Miss Webb as drama coach, Lake Mills High School will have two drama coaches, just as it probably has more than one history or English teacher. How drama coaching duties are to be allocated between Miss Webb and Miss Koch is a matter lying solely within the discretion of the school administration. The Court is simply saying this: Miss Webb must be reinstated as a drama coach, for she was terminated from that job in violation of the Constitution of the United States.

At this point it is appropriate to discuss defendants' contention that the equitable doctrine of laches precludes Miss Webb from obtaining relief in this Court. The doctrine of laches is often employed when the party seeking relief has lulled the opposing party into security because of the time that has past since the events complained of occurred; relying on the complaining party's inaction, the opposing party has altered its position to the extent that to give the

3. This is not a simple case of reassignment of a teacher as defendants suggest. Miss Webb was specially hired as drama coach and was paid additionally for that job. When the defendants fired Miss Webb as drama coach, they proposed to take away the additional pay she was receiving for that position. Thus, the cases of McGuffin v. Willow Creek Comm. Sch. Dist., 182 N.W.2d 165 (Iowa, 1970), and Griffin v. Red Oak Comm. Sch. Dist., 167 N.W.2d 166 (Iowa, 1969), holding that a school board can substitute new teaching duties for old ones as long as the teacher receives the same pay are not applicable. Here the defendants did not substitute new duties for former ones; instead, they terminated a teaching duty and diminished Miss Webb's pay.

complaining party relief at such a late date would impose unconscionable burden on the opposing party. Defendants contend that, at the time this action commenced, over six months after the events complained of took place, they had hired a new drama coach and were proceeding with plans for drama activities under the new coach's supervision. The Court notes, however, that the new coach, Miss Koch, was hired at the same time Miss Webb was fired, and before Miss Webb was given her hearing before the Board. In addition, the Board promised Miss Webb as late as August of 1971 that it would review its decision to terminate her as drama coach. The facts in this case do not show that Miss Webb lulled the defendants to such security that they changed their position materially as a result of her inaction. Accordingly, the doctrine of laches has no applicability here.

Miss Webb is receiving a salary of $7,412.00 for the school year 1971–72, the same salary she received for the previous year. Had she received the usual salary increments for an English teacher-drama coach with her teaching experience, she would be receiving $7,797.00 for the year 1971–72. The Court concludes that Miss Webb has been damaged in the sum of $385.00 as the result of the unconstitutional action taken against her.

The Court finds no substantial evidence that Miss Webb has suffered any loss of reputation. Many of the citizens of Lake Mills have supported her in her fight with the defendants. Nearly all of the newspaper publicity, most of it coming as the result of the institution of this lawsuit, has been favorable to Miss Webb. There has been no convincing showing that Miss Webb will not be hired as drama coach in another school because of the incident at Lake Mills. The Court further finds that there has been no showing that Miss Webb suffered any grievous mental pain and anguish because of the defendants' unconstitutional action.

## V.

Defendants assert that this Court does not have subject matter jurisdiction over this action because Miss Webb has failed to exhaust her state administrative remedies. There has been a deluge of recent cases from the Supreme Court of the United States and the Court of Appeals for the Eighth Circuit stating that exhaustion of state administrative remedies is not a prerequisite to the proper institution of a lawsuit under 42 U.S.C., Section 1983. E. g., Carter v. Stanton, 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (April 3, 1972); Gilliam v. City of Omaha, 459 F.2d 63 (8th Cir., April 25, 1972); McClelland v. Sigler, 456 F.2d 1266 (8th Cir., March 22, 1972).

Defendants further contend that this Court should abstain to allow Iowa courts to decide this case under state law. It has long been held that plaintiff's remedy under 42 U.S.C., Section 1983 is in addition to any remedy he might have under State law, and that the availability of a remedy in State court is no bar to an action under the Civil Rights Act of 1871. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Here there is no knotty question of Iowa law to be unraveled before federal law can be applied. In such a case, a federal court should not abstain from deciding a cause of action under 42 U.S.C., Section 1983. Wisconsin v. Constantineau, 400 U.S. 433, 439, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); Stradley v. Anderson, 456 F.2d 1063 (8th Cir. 1972).

Defendant Lake Mills Community School District asserts that the Court does not have subject matter jurisdiction to grant relief against it because it is not a "person" within the contemplation of 42 U.S.C., Section 1983. Monroe v. Pape, *supra*, holds that a municipality is not a "person" under 42 U.S.C., Section 1983, and that, therefore, no relief at law or at equity can be had against a municipality under the Civil Rights Act of 1871. The Court can find only one case deciding the status of

a school district under 42 U.S.C., Section 1983, and it held that the district was a "person." Harkless v. Sweeney Ind. Sch. Dist., 427 F.2d 319 (5th Cir. 1970), cert. denied, 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439 (1971). Many decisions from both the Supreme Court of the United States and the Court of Appeals for the Eighth Circuit have allowed both legal and equitable relief against school districts under 42 U.S.C., Section 1983. *E g.,* Tinker v Des Moines Ind. Sch. Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Hegler v. Board of Education, 447 F.2d 1078 (8th Cir. 1971). This Court concludes, however, that were the issue before the Supreme Court or the Eighth Circuit, they would hold that the Lake Mills Community School District is not a "person" under 42 U.S.C., Section 1983, following the reasoning of Monroe v. Pape.[4] This Court so holds.

### VI.

██ Miss Webb seeks to recover from the defendants her reasonable attorneys' fees. Cases from the Eighth Circuit indicate that attorneys' fees are only to be awarded as a punitive measure where a defendant has acted with obdurant recalcitrance.[5] These defendants, although somewhat stubborn, did not willfully seek to withhold from Miss Webb her constitutional guarantees. They sought and received the advice of an attorney for the Department of Public Instruction before proceeding to terminate Miss Webb as drama coach.

4. Iowa Code Section 274.1 provides:
   "Each school district shall continue a body politic as a school corporation, unless changed as provided by law, and as such may sue and be sued, hold property, and exercise all the powers granted by law, and shall have exclusive jurisdiction in all school matters over the territory therein contained."
   1 U.S.C., Section 1, defining generally the word "person," does not in terms apply to bodies politic. Monroe v. Pape, 365 U.S. at 190 n. 47, 81 S.Ct. 473. A holding that a school board is a "person" would violate the apparent intend-

Accordingly, it is ordered that the foregoing shall constitute the findings of fact and conclusions of law of this Court in accordance with F.R.C.P. 52(a).

ment of Congress when it enacted 42 U.S.C., Section 1983. Monroe v. Pape, 365 U.S. at 187–192, 81 S.Ct. 473. Absent some explicit law to the contrary, this Court cannot conclude that Congress intended the term "person" in 42 U.S.C., Section 1983, to include school boards.

5. Clark v. Board of Education, 449 F.2d 493, 502 (8th Cir. 1971); Arkansas Educational Association v. Board of Education, 446 F.2d 763, 770 (8th Cir. 1971); Cato v. Parham, 403 F.2d 12, 16 (8th Cir. 1968); Kemp v. Beasley, 352 F.2d 14, 23 (8th Cir. 1965); Rogers v. Paul, 345 F.2d 117, 125–126 (8th Cir. 1965).