**Richard L. PRESS, Plaintiff,**

**v.**

**BOARD OF REGENTS OF the UNIVERSITY SYSTEM OF GEORGIA, et al., Defendants.**

**Civ. A. No. 79–17–ATH.**

United States District Court, M. D. Georgia, Athens Division.

April 30, 1980.

---

151

J. Hue Henry, Henry & Marshall, Athens, Ga., for plaintiff.

Arthur K. Bolton, Atty. Gen., Alfred L. Evans, Jr., Asst. Atty. Gen., Atlanta, Ga., for defendants.

RULING ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

OWENS, District Judge.

Plaintiff, a former librarian at the University of Georgia, in this case challenges his transfer within the library system and the subsequent non-renewal of his contract with the University. Plaintiff complains that this action by University officials deprived him of his constitutional rights, both because the manner in which he was transferred did not provide him procedural protections guaranteed by the Constitution and because the underlying reasons for his transfer and termination of his employment were violative of his right to free speech. The action is now before the court on the Board of Regents' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, wherein the Board of Regents claim that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law.

Dr. Richard L. Press was first employed by the University of Georgia Libraries in the summer of 1975. He was appointed Assistant Director of the University Libraries in February 1976 and was placed in charge of the Collection Division. At all times pertinent to the instant action Dr. Press was non-tenured, his employment with the Libraries being pursuant to three fiscal year contracts.

The University of Georgia Libraries consist of both on-campus operations and those operations located off-campus throughout Georgia which are a part of the University of Georgia (hereinafter "University"). The central administration for the Libraries is located at the Main Library on the University campus in Athens, Georgia.

At the time Dr. Press was employed the University Libraries were beset with serious administrative and personnel problems. One particularly acute area of discontent was the "specialist problem",[1] a problem

1. Specialists within the Libraries were persons who, while not holding a Master of Library Science degree, did hold other advanced degrees, had been employed as bibliographic specialists and considered themselves to be under-paid and lightly regarded by those holding the M.L.S. degree. The chief complaints were of low salaries and lack of opportunity for advancement.

which had created a polarization between the administration and the staff within the Libraries.

Recognizing the serious problems within the Libraries, the University appointed several committees to study the situation and recommend those changes which could be implemented to remedy the problems. The first committee, chaired by the head of the History Department, Gilbert C. Fite (hereinafter "Fite Committee"), consisted of faculty members appointed by the Acting Provost of the University at the request of University President Fred C. Davison on March 14, 1977. On June 1, 1977, the committee recommended the immediate implementation of "University administrative and investigative review procedures, including those provided in the University's Affirmative Action plan, for the purpose of establishing the necessary facts upon which administrative decisions could be made by the proper University officials."

Pursuant to the recommendation of the Fite Committee, a library review panel, chaired by Acting Vice President for Academic Affairs Merle C. Prunty (hereinafter "Prunty Committee"), was appointed and conducted an investigation through the summer of 1977, an investigation which consisted primarily of staff interviews. The committee report, completed September 30, 1977, confirmed the existence of the administrative and personnel problems and recommended, *inter alia*, the removal of Library Director Warren N. Boes and his Associate Director Donald N. Petty. The men were then notified that their contracts would not be renewed; however, Mr. Boes was told that his contract would not be renewed unless he resolved the conflicts within the Library. Mr. Boes was unable to resolve those issues and his contract was not renewed for the 1978–1979 school year.

Shortly after Mr. Boes was notified in January 1978 that his non-renewal notice would not be withdrawn, Dr. Virginia Trotter, Vice President for Academic Affairs,

appointed Dr. Leroy Ervin, Assistant Vice President for Academic Affairs, as Acting Associate Director of the Library. This temporary appointment was designed to ease the existing personnel problems. One of Dr. Ervin's initial steps was to implement the Office of Personnel Services' proposal to remedy the Specialists problem.[2]

On February 2, 1978, Dr. Ervin and Carlton James, Director of Personnel, met with the Assistant Directors of the Library to explain the newly developed specifications for the Specialist employees. Each Assistant Director was requested to examine the new plan and ascertain how the Specialists under their control should be designated. Mr. James and Dr. Ervin met again with the Assistant Directors on February 8, talking first with each Assistant Director individually and then meeting with them as a group that evening. All Assistant Directors except for Dr. Press were found to have come up with recommendations which were substantially in agreement with the Personnel Director's specifications. Dr. Press insisted that all of his Specialists should be promoted and if this was impossible all should be kept at the lower grade. Unable to reach an agreement with Dr. Press, Dr. Ervin announced that he would make a decision as to the classification of Specialists within Dr. Press' department. At the close of the meeting Dr. Ervin explained that this management decision to reclassify Specialists would not fully resolve this issue but would be a step in the right direction. Dr. Ervin said that management would have to be unified in its support of the plan if additional discontent was to be avoided; Dr. Ervin then asked each Assistant Director to support the decision when presented to his or her staff. Because of Dr. Press' disagreement with the plan, Dr. Ervin expressly asked him to support the change and Dr. Press expressly told him that he would support the decision.

On Friday, February 10, 1978, Dr. Press and Dr. Ervin met with the Specialists who

---

**2.** The proposed remedy offered a two-step classification for Specialists within the Libraries. It was seen by the Office of Personnel Services as a means of constructing a promotion ladder. Each level provided for a separate salary schedule.

worked under Dr. Press. Dr. Press read parts of a letter written by Mr. James concerning the problem, a letter which was to have been treated as confidential.[3] It was the judgment of Dr. Ervin that Dr. Press' focus on arbitrary features of the new plan while ignoring the long-range overall benefits was a deliberate attempt to influence the Specialists to take sides against management, an attempt which would further polarize the factions within the Library. Dr. Ervin privately expressed to Dr. Press his disappointment over Dr. Press' conduct and stated to him that he would not tolerate such behavior from an Assistant Director.

During the ensuing two weeks, the situation between Dr. Press and Dr. Ervin, as well as Dr. Press and the other Assistant Directors, further deteriorated. Dr. Press refused to agree with a management decision with regard to another personnel problem, stating that it would be difficult for him to support something he did not believe in. Dr. Ervin received a letter from Dr. Press which was highly critical of the Library administration's handling of a personnel matter involving an alien whose employment was in violation of federal law. Dr. Ervin also received a complaint from two department heads which was extremely critical of Dr. Press' leadership and management. Dr. Press' proposal to remedy that matter was a request to transfer one of the critics out of his office. On the basis of the above actions and Dr. Press' actions in general Dr. Ervin concluded that Dr. Press' attitude and resistance to management policies necessitated his removal from his administrative position in the Main Library.

On February 23, 1978, Dr. Ervin went to Dr. Press' home to discuss the overall situation with him. The discussion ended with Dr. Ervin informing Dr. Press that he was forced to remove him from the Main Library. Dr. Press was formally advised of his reassignment to the Experiment Station

Library at Griffin, Georgia effective as of February 27, 1978, by letter from Warren Boes on February 24, 1978.

Upon Dr. Press' request, the reassignment was delayed from February 27 to March 1 and was ultimately rescinded in favor of an alternative transfer. On March 1, Dr. Trotter appointed a five-member faculty committee headed by James B. Colvert (hereinafter "Colvert Committee"), to advise the University administration on matters pertaining to the Library, and particularly on the matter of adverse faculty and public reaction to the transfer of Dr. Press. At a hearing on March 3, Dr. Press was given two and one half hours to present his side of the controversy. The Colvert Committee found that Dr. Press' account of the matters surrounding his transfer was consistent with Dr. Ervin's. The Committee recommended that Dr. Press be assigned to the Athens campus in an appropriate position which entailed no managerial or administrative functions. A majority of the Committee also deemed the only other acceptable alternative to be termination of Dr. Press for managerial insubordination.

Acting on the recommendation of the Colvert Committee, Dr. Trotter, on April 12, 1978 advised Dr. Press that he was being transferred at the same salary and with the same title to the College of Veterinary Medicine where he would serve as Senior Consultant for Library Collections to the Dean of that college. The following day Dr. Trotter advised Dr. Press that he would not be offered an employment contract for the 1979–80 school year. The official written notice of non-renewal required by Board of Regents' policy was in due course given to Dr. Press on June 19, 1978.

The entire matter was appealed to the Board of Regents of the University System of Georgia, which provided him a hearing before a Special Hearing Committee of the Board on September 29, 1978. The eighthour hearing produced a twenty-one page

---

**3.** The confidential nature of the letter is in dispute. However, it is important because of the testimony by Dr. Press' superiors who believed it to be confidential and who testified that such a belief was a part of their consideration in transferring Dr. Press. The subjective impressions of Dr. Press' superiors are therefore not in dispute.

report wherein the Committee concluded that Dr. Press had not been denied any of his rights under the Constitution of the United States and that his transfer and non-renewal were proper. The recommendations of the Committee were adopted by the Board of Regents on December 13, 1978.

Dr. Press thereupon filed suit in this court on February 27, 1979, contending that his transfer and non-renewal violated rights secured to him by the Fourteenth Amendment to the United States Constitution, the First Amendment to the Constitution, and by various laws of the State of Georgia.

The plaintiff first contends that his "due process" rights under the Fourteenth Amendment to the Constitution were violated by the University's failure to allow the plaintiff to be heard before any action on the part of the University was commenced.

■ It is well settled that success of "due process" arguments depends upon the finding of a constitutionally protected property interest in the expectation of continued employment, or of a liberty interest having been infringed by the State; absent such interest no due process protections attach to plaintiff's employment or administrative position. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 91 S.Ct. 2226, 33 L.Ed.2d 570 (1972); *Ball v. Board of Trustees*, 584 F.2d 684 (5th Cir. 1978). Holding that the range of interests protected by procedural due process is not infinite, the Court, in *Roth* stated that a person claiming a property interest in a benefit "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, at 577, 92 S.Ct. at 2709. The Court further held that property interests, by their nature, are created and their dimensions defined by "existing rules or understandings that stem from an independent source such as state law." *Id.* Without such a property interest, the non-renewal employee is without a constitutional right to a statement of reasons and a hearing on the employer's decision not to rehire him for another year.

■ With respect to the instant action, the record is clear that Dr. Press was a non-tenured employee within an employment structure which utilizes a formal tenure system. The record also discloses that each of the one-year contracts signed by him expressly negates future employment absent a new and separate offer by the Board of Regents on behalf of the University of Georgia. Having no claim to continued employment Dr. Press had no right to a statement of reasons for non-renewal or a hearing on the University's decision not to rehire him for the 1979–1980 school year. *Board of Regents v. Roth, supra; Perry v. Sindermann, supra.*

Dr. Press does, however, claim that he has a protectable property interest in his position as Assistant Director for Collection Development, University of Georgia Libraries. He further claims his reassignment to the College of Veterinary Medicine without a hearing on the decision to transfer him violated his due process rights. This contention is *without merit*. The 1977–1978 contract tendered to Dr. Press offered him the administrative position of Assistant Director for Collection Development. The Board of Regents' policies provide that no tenure attaches to an administration position at the University of Georgia for any period of time whatsoever, the holding of all administrative positions being at the pleasure of the President. The University was therefore free to relieve Dr. Press of his administrative or managerial responsibilities at any time for any reason or no reason at all. *Roth, supra; Perry, supra.*

■ "A due process claim for violation of a 'liberty interest' entitling [Dr. Press] to a full hearing would arise if—and only if—the reason given or the dismissal procedure adopted resulted in a 'badge of infamy,' public scorn or the like." *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Ball v. Board of Trustees of Kerrville*, 584 F.2d 684 (5th Cir. 1978). The reasons cited for Dr. Press' transfer and

non-renewal for the 1979–1980 school year were simply those of inability or unwillingness to work harmoniously with his immediate administrative superior or with the other Assistant Directors of the University of Georgia Libraries. Nowhere does the record indicate any criticism of Dr. Press' ability to function as a librarian—the occupation for which he was trained. A charge of inability to get along with one's administrative superiors or co-workers is not sufficient to create a "badge of infamy" sufficient to implicate a "liberty interest" protected by the Fourteenth Amendment. Based on the record the court does not think the above allegations are "one[s] 'that might seriously damage his standing and associations in his community', *Roth, supra,* and which call into question his 'good name, reputation, honor, or integrity.'" *Dennis v. S & S Consolidated Rural H. S. Dist.,* 577 F.2d 338 (5th Cir. 1978).

■ Even assuming that Dr. Press successfully made out a claim of stigmatization, he would be entitled only to an opportunity to refute the charge and clear his name. *Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977); *Roth, supra,* 408 U.S. at 573, n. 12, 92 S.Ct. at 2707 n. 12; *Dennis v. S & S Consolidated Rural H. S. Dist., supra,* 577 F.2d at 344. The University correctly contends that the hearings before the Colvert Committee and the Special Hearing Committee of the Board of Regents provided a hearing which comports with the Fourteenth Amendment.

Dr. Press also complains that his reassignment to the College of Veterinary Medicine constituted a "demotion", relying upon the definition of demotion articulated by the Fifth Circuit Court of Appeals *en banc* in *Singleton v. Jackson Municipal Separate School Dist.,* 419 F.2d 1211 (5th Cir. 1970). The definition which Dr. Press would now seek to use is, however, limited to govern the problems relating to the desegregation of faculties in the context of consolidation following the dismantling of dual school systems. *See, Lee v. Russell City Bd. of Ed.,* 563 F.2d 1159 (5th Cir. 1977); *Pickens v. Okolona Municipal Separate School Dist.,*

527 F.2d 358 (5th Cir. 1976). The instant facts in no way invoke the *Singleton* rule, leaving Dr. Press to proceed on a property or liberty interest argument. That issue having been decided adversely against Dr. Press, the court finds that Dr. Press was not demoted or reassigned in an unconstitutional manner.

■ Dr. Press finally alleges that the adverse personnel action in his situation result from the manner in which he has exercised his First Amendment rights of "free speech", namely his criticisms and evaluations of his administrative superiors. Dr. Press contends that a public criticism of one's superiors on matters of public concern is an impermissible basis for termination of his employment. The plaintiff relies primarily on *Givhan v. Western Line Consolidated School Dist.,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) wherein the Court held:

"The First Amendment forbids abridgement of the 'freedom of speech'. Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public. We decline to adopt such a view of the First Amendment."

The plaintiff therefore argues that his criticism was subject to the protection of the First Amendment. The protection he is afforded is not, however, absolute; rather in determining whether a government employee's speech is constitutionally protected, the "interests of the [employee], as a citizen, in commenting upon matters of public concern" must be balanced against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *See Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The Court concluded in *Pickering* that "the interest of the school administration in limiting teacher's opportunities to contribute to public debate [was] not significantly greater than its interest in limiting a similar contribution by any member of the gen-

eral public." *Id.* at 573, 88 S.Ct. 1731, at 1737, 20 L.Ed.2d 811. The *Pickering* Court's decision upholding a teacher's First Amendment claim was influenced by the fact that the teacher's public statements had not adversely affected his working relationship with the objects of his criticism, a fact that was reaffirmed in *Givhan, supra,* 439 U.S. at 414, n. 3, 99 S.Ct. at 696, n. 3. The Court in *Givhan* cited language from the *Pickering* decision which is helpful to the court's analysis today:

"The statements [were] in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or harmony among coworkers is presented here. Appellants' employment relationships with the Board, and to a somewhat lesser extent, with superintendent are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning."

The *Givhan* Court went on to state:

"Although the First Amendment's protection of government employees extends to private as well as public expression, striking the Pickering balance in each context may involve different considerations. When a teacher speaks publicly, it is generally the *content* of his statements that must be assessed to determine whether they 'in any way either impeded the teacher's proper performance of his daily duties in the classroom or . . . interfered with the regular operation of the schools generally.' [Pickering Board of Education, supra, 391 U.S.] Id., at 572–573, 88 S.Ct. 1731 [, at 1737] 20 L.Ed.2d 811. Private expression, however, may in some situations bring additional factors to the Pickering calculus. When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered." *Supra,* at 415, n. 4, 99 S.Ct. at 696, n. 4.

In light of the Court's pronouncement in *Givhan,* this court concludes that the plaintiff's private speech was not protected by the First Amendment. The Court in applying the *Pickering* balancing test specifically finds that Dr. Press' criticisms were personally directed toward his immediate superiors who were charged with implementing Library policy, that Dr. Press' criticisms threatened the University Libraries' efficiency, not only by its content but also by the manner, time, and place in which it was delivered. Dr. Press chose, as perceived by Dr. Ervin, to present a distorted view of the specifications for Specialists—to present that view at a time when there was a great need for management solidarity to resolve the personnel problems and to present those views at a place which would serve only to underscore the lack of solidarity within Library management. The court further notes that Dr. Press's speech did not involve the robust exchange of ideas within the classroom, a freedom which is a special concern of the First Amendment, *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967); rather, Dr. Press' speech was directed solely at personnel problems which would in no way stagnate the right of teachers and students to inquire, to study and to evaluate academic ideas and philosophies.

In sum, Dr. Press failed to comprehend his role within the Libraries as that of manager, a role which requires compliance and obedience to management policy even if he comprehends that policy to be ill-drawn. Choosing instead to externally vocalize his criticism and resist management policies, he took the risk that his conduct and speech would alienate him from others within the management ranks, an alienation which destroyed his working relationship within the structure. Absent a showing that the plaintiff's statements—both public and private—have not adversely affected his working relationship with the objects of his criticism, he cannot now request this court to invoke its powers to reinstate him, for to do so would require the

court to arbitrate every management decision which results in an unfavorable result to a manager who possesses a view different from management.

In light of the fact that the plaintiff's federal claims are without merit, the court chooses not to entertain whatever claims the plaintiff may have under state law. *See Ball v. Board of Trustees, supra,* at 685.

Based on the entire record and for the reasons heretofore stated, the defendants' Motion for Summary Judgment must be and is hereby GRANTED.